Isadore SKLARSH, as Administrator of the Goods, Chattels and Credits of Al Sklar, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 19494.

United States District Court
E. D. New York.

May 19, 1961.

Herbert E. Rosenberg, New York City, for plaintiff.

Joseph P. Hoey, U. S. Atty. for the Eastern District of New York, Brooklyn, N. Y., for defendant, by Ned Frank, Asst. U. S. Atty., New York City, of counsel.

BYERS, District Judge.

This is a Federal Tort Claim case instituted by the administrator and brother of Al Sklar, deceased, against the United States. The complaint was filed February 17, 1959 and originally listed as co-defendants the Director of the Veterans Administration and certain doctors and nurses connected with the United States Veterans Administration hospital at First Avenue and 24th Street, in the Borough of Manhattan.

By stipulation of July 14, 1959, the action was dismissed as to all such individuals, and proceeded to trial as against the Government only.

The decedent was a mental patient in the said hospital who had threatened to commit suicide, and is deemed for present purposes to have done so, on October 15, 1958 at some time between 10:30 and 11:00 p. m. There was no eyewitness to the episode, but the discovery of his body at some time around 11:00 p. m. outside the building and somewhat in line with a window in his room on the tenth floor of the hospital, was consistent with such a happening.

Sklar had been admitted on January 16, 1958 and was transferred to the "clos-

ed" ward on the 18th floor eleven days later. He was transferred to the open ward on April 10, 1958 and there remained until August 15th, when he was returned to the closed ward. Prior to the latter date he had been allowed to return to his home for brief visits on weekend "passes."

His stay in the closed ward continued until October 8, 1958 when he was moved to the surgical ward where he was operated on the following day to relieve a serious condition of the adrenal glands. The operating surgeon [Dr. Sax] described it as a "Cushing Syndrome." Only the gland on the left side was removed because of hemorrhage, although the original intent had been also to remove the one on the right.

This means that the surgical procedure had not been concluded, and the patient was returned to his bed in a private room, to recuperate for the second half of the operation.

He was a bed patient for the ensuing four or five days, though ambulatory on October 15th when Dr. Sax walked with him a few steps.

It should be said that the surgical ward could accommodate forty patients and was full on these days. This suggests that the nursing force in this ward had many and constant duties.

Dr. Sax talked with the decedent at about 6:00 o'clock on the 15th and observed nothing to cause apprehension or to suggest that he address a word of warning to those who were in the nurses' station adjoining the patient's room.

Dr. Sax was aware of the decedent's threats of suicide, and was familiar with the special requirements concerning patients who had been transferred from the closed to the surgical ward. He testified as to the recognized standards of supervision in such cases, and said: "We gave this patient even more than was required."

During the post-operative period, Dr. Silver visited decedent every two or three hours during the daytime; he always found the two windows locked, and never

saw one open. His opinion was that the patient, who was 5′ 7″ in height and weighed 160 pounds, probably could not have raised the window which was later found open, because of the extra effort that would have been so required.

Dr. Silver had discussed with Dr. Meade of the psychiatric staff, the removal of decedent back to the closed ward (pending the second operation) and neither was of the opinion that it was necessary.

Dr. Waltzer, the resident psychiatrist, was familiar with this patient's mental condition, and with the type of supervision exercised while he was in the surgical ward; in his opinion it was adequate and it was not necessary to assign someone to act as a bodyguard for the decedent in view of the constantly open door of his room alongside the nurses' station, and the frequent visits to his room while the patient was there, by the doctors and nurses on duty. Moreover it was his belief that the mental depression itself would be somewhat favorably affected as the result of the adrenal operation. He was aware of Dr. Carr's warning (he was of the psychiatric staff) that twenty-four hour supervision would be required while the patient was in the surgical ward but was skeptical about the seriousness of the latter's suicide threats.

If it could be seen from the testimony that the supervision fell short of reasonable requirements, this difference of opinion between two members of the same staff might present a more serious problem than this record is seen to constitute.

In observing the operations of the mental faculties of a given individual, there may be a justifiable difference in instructed opinion as to their true nature. The expression used by Dr. Carr— who was not called as a witness—was "24 hour supervision" which the evidence indicates the patient received, albeit he or someone acting for him, was able to elude its purpose as to the open window.

The Court was impressed by the testimony of Ada Lee, the staff nurse who was on duty during the evening of October 15th. She was in the patient's room at about 10:00 o'clock and could not remember if either window was open at that time, since it was not always possible to see a window clearly when looking through the inside wire screen. She said that the latter was never raised.

She had a brief conversation with the patient as to his need for medication (milk of magnesia) and administered a sedative. It was the same kind of a talk as she had had with him on previous nights, and he said nothing to her to cause her to have any apprehension about his state of mind. She said he had been walking to and from his room, between 8:00 and 10:00 o'clock that evening.

It is to be noted that the plaintiff testified to complaints that he said he made on October 15th about the open window, but these were denied by such witnesses as he was able to name or designate. He also said that decedent had informed him in effect that he would not submit to the second operation, and would find a way to avoid it, which caused plaintiff to complain on October 15th at 8:00 p. m. of the then open window in decedent's room, by speaking to those then in the nurses' station.

This testimony which was disputed cannot be thought to overcome that which has been recited, as to the measure of care exercised by the Veterans Hospital in connection with an unfortunate man who was forced to become the kind of a patient that the decedent is shown to have been.

It was stipulated that if Robert Flournoy were called he would testify that he was an orderly on duty during the night of October 15, 1958 in the surgical ward; that he had been instructed by Mrs. Politte, who was the ward secretary, to look in the room of decedent every ten minutes, and that he had done so. Seemingly he observed nothing that aroused his attention.

The last named Jennie E. Politte, whose duty did not include a visit to the patient's room, was present at her post until 4:30 in the afternoon of the 15th.

She said she had a conversation between 3:30 and 4:00 p. m. with a lady who said that Sklar wanted to have his window open; her memory is that the lady said: "My husband Al Sklar wants the window open." The witness told her that this could be done only by a hospital employee, which ended the conversation.

The decedent's wife was not called as a witness, which suggests the possibility that she could tell how the window came to be opened, and when; obviously no finding can be made on the subject.

The upshot of the testimony is that the window must have been opened, but by whom is a mystery. When that was done is also obscure. Seemingly the plaintiff's cause comes down to the contention that the hospital was at fault for permitting that to happen at any time or under any conditions whatever.

That contention has been examined in the light of the precautions that were taken to safeguard this patient from himself, and it cannot be said that the evidence discloses the omission of any reasonable precaution that could have been foreseen.

The test stated in United States v. Gray, 10 Cir., 199 F.2d 239, at page 242, is thought to be the correct one. That was close enough factually to permit a quotation from the opinion as to the Government's Federal Tort Claim liability:

"It is the general rule that while a hospital conducted for gain is not an insurer of the safety of its patients against personal injuries, whether self inflicted or otherwise, it is required to exercise ordinary care for their welfare and safety against such injuries. No inflexible and unyielding yardstick can be laid down as constituting ordinary care or the lack of it in all cases. In each case, the question must be determined in the light of its own facts and circumstances. In determining what constitutes ordinary care, the condition of the patient should be taken into consideration. And in the case of a mental patient, the care must be reasonably adapted and proportioned to his known suicidal, homicidal, or other like destructive tendencies." [Citing cases.]

In light of such considerations, the court concluded that the evidence established negligence in that the plaintiff was left alone and unattended following a series of episodes which the court is careful to recite, including this:

"Shortly preceding the accident, plaintiff became agitated; and she was abusive, unruly, and depressed. After breaking a water glass and attempting to put pieces of the broken glass in her mouth, she cried for a time. * * * She again became agitated and abusive, and the medical officer in charge of the ward was called a second time. With all of these antecedent facts and circumstances known, the medical officer and the guard left the room occupied by plaintiff without any attendant being there to watch her and care for her welfare."

Here there were no episodes whatever from October 9th to October 15th indicating any such mental disturbance or manifestation on the part of this decedent as abundantly appeared in the cited case. The testimony of the witness Lee as to the patient's apparent condition at 10:00 p. m. on the night in question reveals the clear contrast between Gray and this case.

The testimony as a whole convinces this Court that the care and supervision exercised over the plaintiff's intestate was much in excess of what has been called ordinary in Gray.

The fact that Sklar was able to circumvent the precautions taken to protect him against himself, demonstrates not that the supervision was at fault, but that he was sufficiently adroit to be able to effect the promptings of a disordered mind.

The conclusion is that the evidence does not sustain the plaintiff's cause as pleaded, and that judgment must be entered in favor of the defendant.

478

The foregoing is deemed sufficiently to state the findings and conclusions of the Court within Rule 52(a) F.R.Civ.P. 28 U.S.C.A., but if additional findings are desired, they may be settled on notice.