**Vera G. EANES, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 4494.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 13, 1968.

Fred P. Aucamp, Norfolk, Va., for plaintiff.

Lawrence A. Klinger and Thomas L. Young, Dept. of Justice, Civil Division, Tort Section, Washington, D. C., C. V. Spratley, Jr., U. S. Atty., Norfolk, Va., for defendant.

MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

During the early morning hours of October 1, 1963, Paul D. Eanes, armed with a claw hammer, brutally attacked his wife, Vera G. Eanes, the plaintiff herein. This action is instituted under the Federal Tort Claims Act, 28 U.S.C., Sections 1346(b), 2674, with the plaintiff contending that her husband should not have been granted leave by the authorities at the Veterans Administration Hospital at Kecoughtan, Hampton, Virginia, to visit his home for a period of time shortly prior to the occurrence of the vicious attack. Subsequent to the attack on October 1, 1963, Eanes was committed to the Southwestern State Hospital, an institution for the criminal insane. He has not, apparently, ever been tried for the crime which took place in Chesapeake, Virginia, and, according to the record the charges have been dropped. He was transferred to the Veterans Administration Hospital, Salem, Virginia, on April 23, 1965, where he is

presumably now a patient. He was apparently legally committed as insane after the attack in question.

Plaintiff testified that her husband had always been a jealous person, but that any outward manifestations of jealousy from the standpoint of the wife were first noticed in 1961. The parties were married in 1944. In 1963 Eanes was 64 years old, but his wife was younger by approximately 20 years. While the various medical authorities could readily note the age differential, there is nothing in the record to indicate that manifestations of jealously were apparent until after Eanes' commitment to Southwestern State Hospital.[1]

In August 1962, Eanes went to see a general practitioner, Dr. Edward D. Harris, who proceeded to treat Eanes for nervousness, anxiety and depression. It seems that Eanes was concerned with his long-standing positive serological studies indicating a possibility of syphilis, as well as his prostate problems. At the instance of Dr. Harris' associate Eanes was hospitalized on December 16–17, 1962, for anxiety and depression. During the course of his treatment by Dr. Harris, there were varying degrees of improvement and regression. He was first seen by Dr. Harris in August 1962; next on January 16, 1963; and with some degree of continuity during February and March, during which time Eanes left his employment as an operator of an airline limousine, either due to his own condition or due to the fact that his wife, the plaintiff herein, was in Duke University Hospital being treated for a detached retina, or perhaps a combination of both factors. Eanes may have worked for about one week during the middle of April. On April 29, Dr. Harris recommended that Eanes see a psychiatrist, but he refused as he indicated that he did not need such services. However, at no time did Dr. Harris ever con-sider Eanes as dangerous to himself or others. Finally, shortly prior to May 17, 1963, Dr. Harris was successful in persuading Eanes to see a psychiatrist for, on the latter date, Eanes was seen by Dr. Dietrich W. Heyder, a qualified expert in the field of psychiatry.

Dr. Heyder caused Eanes to be admitted to Norfolk General Hospital on May 18, where he remained until his discharge from the hospital on June 14 as "improved," to return for psychotherapy. He did not return and apparently entered the Veterans Administration Hospital a few days thereafter. At no time during Eanes' extended treatment at Norfolk General Hospital was Dr. Heyder ever advised by the plaintiff or anyone as to any acts of violence, or threatened violence.[2] If he had been so advised, Dr. Heyder states that he would have treated him longer, or otherwise caused him to be placed in a state hospital for protective reasons. When Dr. Heyder discharged Eanes on June 14, 1963, he did not consider Eanes a danger to others. It was the impression of the doctors at Norfolk General Hospital that they were "dealing with a sub-acute depression on the basis of a chronic brain syndrome associated with arteriosclerosis —possibly a differential diagnosis of pre-senile syndrome." An EEG request in the hospital records reveals the following:

"Patient has acute depression, is agitated * * * Complaining, demanding, talking of domestic troubles."

Dr. Heyder's final diagnosis reads:

"The 64 year old patient was admitted for unmanagability (sic) at home. A course of electroshock treatment lead to symptomatic improvement. Outpatient psychotherapy will be administered under the diagnosis of depressive reaction, acute, and paranoid personality with psychosomatic difficulties."

---

1. Likewise, there is nothing in the record to reflect that the medical authorities had any information to the effect that Eanes had threatened to throw acid in the plaintiff's eyes, cut her veins, shoot her, or the occasion of his raising a bottle in front of her.

2. It is significant to note that the plaintiff was treated by Dr. Heyder following her serious injuries.

While Dr. Heyder has no recollection of any history of prior marital troubles, the EEG request does indicate that Eanes had talked of same. In any event, the failure, if any, to notify the Veterans Administration Hospital must be attributed to Dr. Heyder and not to the Government.

On June 23, 1963, Eanes was seen by Dr. Lois T. Sawyer at the Veterans Administration Hospital, prior to his actual admission on the following day. The admitting diagnosis was (1) gastroenteritis, (2) recurring prostatitis, and (3) Schmerl's node. Several days thereafter it appeared that the physical complaints were subsumed by the mental condition of the patient as, on June 27, Dr. Walker Stamps, the Assistant Chief of Medicine at the Veterans Administration Hospital and a board-certified internist, made the entry, "Patient is primarily a mental case." Eanes had developed a cancer phobia and was convinced that the doctors would not disclose to him his true condition. Despite reassurances to the contrary, Eanes persisted in his belief. On June 28, while running a fever of 103 degrees, and while mildly delirious, Eanes either dropped or threw a urinal. These acts, and Eanes' beliefs, prompted Dr. Stamps to request a neuropsychiatric examination. On July 3, 1963, Eanes was seen by Dr. John H. Furr, a consultant psychiatrist who is well qualified in the field of his endeavor. After obtaining a history and conducting an evaluation, together with a not-too-clear psychiatric history, Dr. Furr arrived at the conclusion that Eanes was suffering from (1) chronic brain syndrome associated with cerebral arteriosclerosis, mild, and (2) anxiety reaction. Dr. Furr pre-

scribed drug therapy consisting of mild tranquilizers, meprobamate 400 to 800 mg., four times a day. This course of treatment seemed to alleviate Eanes' condition after a reasonable period of time. Dr. Furr further recommended:

"Since the patient is unable to give a very clear or accurate psychiatric history, it might be a good idea to write to Dr. D. Heyder at the Norfolk Mental Center for details of his recent psychiatric illness and hospitalization."

Under date of July 26, the Veterans Administration Hospital requested from Norfolk General Hospital a "final summary or a brief report of treatment rendered." This report was submitted on July 31, 1963, indicating as a final diagnosis "Depressive Reaction, acute." Dr. Stamps and Dr. Carlton J. Casey, the latter being Chief of Medical Service and a board-certified internist, reviewed the report, together with Dr. Furr's three-page report, and noting the comments relative to "chronic brain syndrome associated with arteriosclerosis," concurred in the findings. Even prior to the receipt of the report from Norfolk General Hospital, Drs. Stamps and Casey prepared an interim summary dated July 29, 1963, with an established clinical diagnosis of (1) chronic brain syndrome due to arteriosclerosis, (2) anxiety reaction, (3) cystitis due to aerobacter aerogenes, and (4) thrombophlebitis, veins of left lower extremity due to undetermined organism. There is nothing in the report received from Norfolk General Hospital which would lead to any contrary diagnosis.

Eanes remained in the hospital until August 31, 1963 [3] when he was granted a 96-hour therapeutic pass.[4] He re-

---

3. Counsel make reference to the therapeutic pass being given on August 29, 1963. We believe the record will indicate that this pass was actually issued on August 31, probably in the early morning, as the nursing notes for August 30 reflect "Quiet night. No complaints," and the entry for August 31 states "Granted week end pass." The doctor's notation for August 29 shows "96 hr. pass. Equanil 400 mg. Q.I.D.

30 days." It is impossible to determine the date of the next entry by the doctor, but it appears to have been made on 8/29/63. The subsequent entry is on September 4.

4. VA hospital regulations provide for the issuance of a pass for an authorized absence not to exceed 72 hours except when a legal holiday falls on a Monday or Friday, in which event the authorized

turned on September 2 and remained until September 9, at which time he again left for a 7-day therapeutic leave of absence. He returned again on September 17 and, on the following day, was granted a 15-day leave of absence, to return on October 3, 1963. Because of the tragic event occurring on October 1, 1963, he did not return as he was in custody of state authorities at the time. He was officially discharged from the hospital as AWOL on October 3, 1963.

The argument is made that Eanes was not furnished a supply of medication to take with him at the time he left the hospital on August 31, September 9, and September 18. We do not believe that the record substantiates this contention. Unfortunately, the actual prescriptions were destroyed by the hospital's pharmacy after a period of three years. The treating nurses whose initials appear on the "medicine and treatment" portion of the record were not produced, and presumably are no longer available. A medical record librarian who assumed her duties at the Veterans Administration Hospital in July 1964—about one year after Eanes left—testified as to the procedure followed by the physicians and nurses. On August 29, 1963, there is an entry "Equanil 400 mg. Q.I.D. X 30, 9–1–5–9." The initials "DE" appear thereon, indicating that a nurse with those initials made the entry. A prior entry reflects that a similar prescription was noted on July 29, 1963, and this entry, bearing like notations, reflects that this prescription was administered daily from August 19 through August 29 (as well as on other days in August prior to August 19), with the notation following August 29 to be "Last Day, J.H." Thereafter, we observe that the prescription was administered on September 3 through 9, while Eanes was in the hospital, and subsequently on September 17–18 which were his last days. There is a separate entry on August 29 reflecting a continuing prescription for another period of 30 days, but no nurses' note indicating that the medicine was administered on August 30. Blood and urine tests were, according to laboratory notes, run on August 30. We conclude that Eanes first left the hospital during the early morning of August 31, but it is impossible from this record to determine whether a supply of drugs was given to him at that time, or on September 9 or September 18 when he again left the hospital. The regulations provide for necessary medications to be furnished. Section 10.14 and Section 10.10b and c. We cannot make an assumption of negligence in failing to provide medications based upon what is before the court.[5]

There is evidence from the plaintiff and her friend, Lillie Wright, to the effect that these ladies visited the Veterans Administration Hospital during the early part of the summer of 1963. Plaintiff argues that the inference from this testimony is that she told Dr. Stamps not to let Eanes come home as she was fearful of her safety. Dr. Stamps denies that such a conversation

absence is not to exceed 96 hours, Section 10.02a. An authorized leave of absence exceeding 72 hours (or 96 hours, if applicable) may be granted, but not in excess of 30 days, Section 10.02b. A trial visit is an authorized absence of 30, 60 or 90 days for a patient with a primary or secondary psychiatric diagnosis "to determine his ability to make a satisfactory adjustment outside the hospital, with a view toward eventual discharge." Extension of trial visit may be given up to 1 year or if committed, the maximum period permitted under the applicable state law, Section 10.02c. Furloughs, applying only to domiciliary members, are authorized absences exceeding 3 days and not in excess of 90 days, Section 10.02e.

5. Drs. Stamps and Casey testified on March 9–10, 1967. The issue regarding any alleged failure to provide medication was not raised until plaintiff's rebuttal evidence on May 17, 1967, at which time Drs. Stamps and Casey were not present. Dr. Stamps had previously testified, "He continued his medical treatment at home." Neither doctor was requested to testify as to the practice with respect to medications for patients leaving the hospital for short periods of time.

took place, as does Dr. Casey as far as he may have been involved. A critical analysis of the testimony of the plaintiff and her companion does not support a finding that such a request was made to either physician. In fact, the plaintiff states that she told Dr. Stamps as to the prior treatment by Dr. Heyder, the shock treatments, and "to go to Norfolk General and get his medical record and I asked him if there was danger of me living with him." When questioned as to Dr. Stamps' reply, she said, "I am not sure what the answer was, to tell you the truth." The witness, Lillie Wright, was very verbose and stated that she happened to walk into the room while plaintiff was conferring with Dr. Stamps. She recalls a conversation relative to Eanes' refusal to sign checks and, when asked about "other conversations," said, "Well, she did beg him not to let him come home because she couldn't take it," to which Dr. Stamps replied, "I know." We reject the suggestion that such a statement, if made, conveyed to Dr. Stamps any information that Eanes was of a dangerous disposition. We believe that no such conversation took place but, if it did, it was during the early stages of Eanes' confinement and nothing had occurred between the time Eanes left Norfolk General Hospital, following which he was at home, and no protest was made to Eanes' actions while at home between August 31 and September 2, September 9 and September 16, and September 18 until the tragic event took place. In fact, plaintiff testified that, prior to October 1, 1963, "everything seemed about as normal as usual" in describing Eanes' behavior on his visits to his home.

Until October 1, 1963, when the attack occurred, there was every indication that a "leave of absence for therapeutic purposes" was in order. Indeed, the regulations state that a sound treatment program encourages such leaves of absence. Section 10.07(b).

We now turn to the post-attack condition of Eanes following his commitment on October 4, 1963. He was actually received at Southwestern State Hospital on October 7, 1963, and remained there until April 23, 1965, when he was transferred to the Veterans Administration Hospital at Salem, Virginia. The diagnosis upon admission was "Irrational conduct." Admitted by all physicians is the fact that Eanes had physical ailments which persisted throughout all treatments. At the time of the staff conference on November 21, 1963, the psychologist, Dr. Centor, expressed the view that Eanes had been "paranoid for a long time." Dr. Joseph R. Blalock, the superintendent and a qualified psychiatrist, made this statement in deferring any diagnosis:

"At the beginning I thought of chronic brain syndrome but after hearing him talk it impresses me more with his paranoid delusions, his rambling and the fact that it takes him a long time to get to the point and beating around. It was more like some type of paranoid condition or schizophrenia. I don't believe we could call it involutional of the paranoid type. There is this complication of prostate trouble and taking of barbiturates, larger doses than had been prescribed and at that time with the slow action of barbiturates I can see where sensorium could still have been somewhat clouded. I think we will defer the diagnosis."

When admitted at Southwestern, Eanes was critically ill. Subsequently he was given the Wechsler Adult Intelligence Scale (WAIS) and Rorschach test. On the WAIS he scored a verbal I.Q. of 97, performance I.Q. of 97 and a full scale I.Q. of 97 (percentile rank 42.1), placing him in the average level of intelligence. Testing indicated that organicity or brain damage affecting intellectual functioning was contraindicated. The Rorschach protocol was negative for schizophrenic thought processes, affective psychosis, neurosis or organicity. Finally, however, on January 20, 1964, the diagnosis was determined to be "Schizophrenic Reaction, Paranoid type," and

Eanes was considered as "mentally incompetent."

That much emphasis was placed by Dr. Blalock and Dr. Centor upon information obtained from the brother and sister-in-law of Eanes in arriving at the final diagnosis indicated above is apparent. Equally true is the obvious fact that these competent officials had the advantage of making a diagnosis some three months following the vicious attack. Dr. Blalock refers to schizophrenia as a psychiatric condition characterized by disturbances of thinking; where there is a disturbance of the content of the mind or interference with contact with reality. To be paranoid indicates that they are apt to be suspicious and develop ideas of someone doing them harm or of being poisoned. Neither, standing alone, would reflect aggression towards others. Individuals are sometimes passive and, as to these persons, the paranoid type reaction is what constitutes danger to the other person, if the individual's ideas get connected with that person in some manner. While in many instances it is not difficult to diagnose schizophrenic reaction, paranoid type, it is far more difficult to determine if the person is intelligent enough to give the right answers and is good at being evasive. There are, of course, many schizoid people who are not psychotic. In the present case apparently Eanes had delusions about his wife's activities, which were not communicated to the Veterans Administration Hospital, but even if communicated it does not necessarily follow that a patient should be precluded from going home for brief or long periods in an effort to rehabilitate him, according to Dr. Blalock. Patients with manic depressive episodes or, to a lesser extent, those with schizophrenic episodes will pass through phases and make a good hospital adjustment which will permit them to be furloughed on home visits.

While Dr. Blalock adheres to his final diagnosis, an examination of his testimony does not suggest any lack of care on the part of the Veterans Administration Hospital. Significantly he points out that Eanes was a physically ill man along with his mental illness. No actual paranoid manifestations were exhibited while at Southwestern State Hospital. As Dr. Blalock states: "Just looking at the day-by-day picture here in the hospital, without getting down, digging in and talking to them about a lot of these other things that come out in the staff meeting, you are more apt to think of them maybe as a chronic, as a psychophysiological condition; in other words, a mental condition associated with a poor physical condition. He had some arteriosclerosis and was getting along a little in years. He was physically sick." Stated in other terms, this was the condition as diagnosed by the Veterans Administration Hospital, its staff, and the consultant psychiatrist, Dr. Furr. Armed with full knowledge of Eanes' delusions as to his wife's activities, and with a comprehensive record of the tragic event of October 1, 1963, it is easy enough to say that the evaluation made by the Veterans Administration Hospital *may* have been erroneous. But viewed from the light of the records from Norfolk General Hospital and the Veterans Administration Hospital there was nothing which would lead a psychiatrist, such as Dr. Blalock, to predict a probability of violent action on the part of Eanes. As Dr. Blalock indicates, the release of a patient suffering from a mental illness is largely a matter of judgment on the part of the doctor on the scene, and any release based upon judgment involves a risk to the patient and society as a whole. As this Court said in White v. United States, 244 F.Supp. 127 (E.D.Va., 1965), affirmed 359 F.2d 989 (4 Cir., 1966):

"Trial visits to the homes and families constitute excellent therapy which is necessary if there is any reasonable possibility that the patient will ever again be able to mix with society and become a useful citizen. Such a therapy program entails risks to the patient and to society as a whole, but it involves a balancing of interests which

is most important in the psychiatric field."

We turn, finally, to the testimony of Arthur Centor, a psychologist at Southwestern State Hospital. It is his contention that Eanes' performance on the WAIS and Rorschach test contraindicated a chronic brain syndrome, thereby eliminating any question of brain damage, and that these tests, if given at the Veterans Administration Hospital, would have pointed to schizophrenia. The psychologist does not state that such tests are so perfected as to rule out brain damage in all cases. Once again, however, we find emphasis on the reports from the brother and sister-in-law, the clear evidence of delusional ideas, and the attack of October 1, 1963. The fact that Eanes tested better than 42.1 percent of the population is not, in the Court's opinion, as conclusive a finding of lack of organic brain damage as the psychologist indicates. We may assume that psychologists will naturally endeavor to upgrade the value of their **tests**. Without attempting to minimize the importance of psychological testing —and acknowledging in hindsight that it may have been of assistance—no psychiatrist has stated that psychological tests will confirm a diagnosis to the exclusion of all others.[6]

Dr. Furr, the consultant psychiatrist, conferred with Eanes for approximately 45 minutes on July 3, 1963, at the request of Dr. Stamps who related that Eanes seemed to have a phobia of cancer. Dr. Furr found Eanes to be extremely anxious and apprehensive, with his memory for recent events being somewhat impaired and likewise being somewhat disoriented as to time and place. While he did not think that Eanes had any delusions, he nevertheless thought that Eanes' ideas were unrealistic and were a possible threat to his personality or his person. To that extent his ideas were rather paranoid, classified as paranoid ideation. Dr. Furr's impression was, as heretofore noted, that Eanes was suffering from a chronic brain syndrome, associated with cerebral arteriosclerosis, mild, with a rather severe anxiety reaction. He defines a chronic brain syndrome as a series of symptoms which are associated with organic brain disease, including confusion, disorientation for time, place or person, repetitious, and impairment of memory. He defines anxiety reaction as being fearful, tense and frightened. His suggestion that the Veterans Administration Hospital contact Dr. Heyder was explained by stating that, since Dr. Heyder treated Eanes at Norfolk General Hospital, Dr. Heyder's records at the hospital would be more complete. Dr. Furr did not consider Eanes to have any propensities towards violence or to be dangerous to others. Dr. Furr's "impression" was, of course, an initial diagnosis. This initial diagnosis is either substantiated or refuted during hospitalization, but in this case Dr. Furr did not feel that another examination was necessary.

As to the value of standardized psychological tests, Dr. Furr expressed the view that if brain damage was ruled out [7] by these tests, his impression would be supported. He explained that the term "chronic brain syndrome" does not necessarily mean "brain damage." With respect to tests taken after Eanes had cleared up intellectually—and his mem-

6. Dr. Blair, a psychiatrist who had the background of a graduate student in psychology, testifying on behalf of the plaintiff, was questioned at length as to the Rorschach test. He conceded that the validity of the test had been questioned by many psychiatrists. He points out that it is a fairly useful tool in the diagnosis of schizophrenia, but is not very reliable with people in the older age groups.

7. As noted infra, the psychological tests given at Southwestern State Hospital demonstrated that brain damage affecting intellectual functioning was contraindicated, and the Rorschach protocol was negative for schizophrenic thought processes, affective psychosis, neurosis or organicity.

ory was clear for all events—with no disorientation, Dr. Furr would then attribute the condition of Eanes on October 1, 1963, to an acute brain syndrome —one that is reversible. As to schizophrenia, Dr. Furr states that there is no impairment of memory with this disease—it generally develops fairly early in life and is characterized by progressive isolation, disturbance of thinking, unrealistic or illogical thinking, reserved behavior, inappropriateness of affect of emotional reaction, etc. In sum, Dr. Furr could find no diagnosis other than that reported by him.

The history of a patient is admittedly of value in making a diagnosis. As to Eanes, Dr. Furr found Eanes' history for recent events to be rather vague, which he indicated to be more consistent with an organic brain syndrome. Because of this vagueness, Dr. Furr thought it proper to secure the notes relating to Eanes' condition at Norfolk General Hospital.

Plaintiff urges that, since the diagnosis made by defendant was erroneous because of failure to use all recognized diagnostic procedures, the defendant cannot be heard to complain of a failure to show that such negligence was not a proximate cause of the injury under Hicks v. United States, 368 F.2d 626 (4 Cir., 1966). We need not decide whether the doctrine in *Hicks* is broad enough to include a diagnosis for a mental condition. It is sufficient to state that, in *Hicks,* there was no controversy between experts as to the basic facts. In the present case there is not only considerable conflict, but the final opinion as to the correct diagnosis is still in doubt. There remains as much basis for a diagnosis of chronic brain syndrome as there is for the diagnosis made by Southwestern State Hospital following a study of more than three months after the tragic event of October 1, 1963. If the *Hicks* doctrine is inapplicable to a diagnosis for a mental condition, we think it clear that the mere release of Eanes under the circumstances of this case, would not be a proximate cause of plaintiff's in-

'juries. However, the final decision does not turn on this point.

We do not believe that Underwood v. United States, 356 F.2d 92 (5 Cir., 1966) is apposite. In that case the Government personnel had actual notice of prior threats and attacks by the mentally ill serviceman upon his wife; a transferred psychiatrist failed to note, or otherwise communicate to his successor, that the patient "had the potential of possibly inflicting harm on someone, himself or her [the wife]; " a hospital corpsman with twelve years' experience in psychiatric work and in charge of the psychiatric clinic, failed to advise the successor psychiatrist of his conversations with the patient's wife, although it may be assumed that he relied upon the statement of the transferred psychiatrist to the effect that he would give the information to his successor; the successor psychiatrist subsequently released the patient and restored him to full duty without recommending any restrictions; the mentally disturbed man later procured a pistol and ammunition in admitted violation of existing regulations. As the Fifth Circuit said:

> "Under the circumstances of the present case, we are left in no doubt that negligently releasing Dunn to duty which gave him access to weapons, and negligently permitting Dunn to draw the .45 calibre pistol and ammunition with which he shot and killed his former wife were proximately connected with Mrs. Dunn's death."

The argument is made that, under the testimony of defendant's expert, Dr. Grissom, negligence must be found in that this witness concedes that, while normally not anticipated, there are many instances of assaultive behavior by one suffering from an organic disease such as chronic brain syndrome. The argument is not without merit as we know that many such instances have occurred. We do not agree, however, that such knowledge automatically convicts the defendant of negligence. There is no evidence that the prevailing standard in the community is to keep confined in a men-

tal institution or hospital all persons having a diagnosis of chronic brain syndrome. To so hold would completely destroy the "open door" policy in effect in substantially every mental institution or hospital throughout our country.

Complaint is made that there was no attempt to discuss Eanes' past life with his wife, brother or sister-in-law; the latter two having been interviewed at the instance of Southwestern State Hospital following his commitment and the commission of the brutal attack. As previously noted, the wife did not communicate to defendant's personnel anything with respect to prior threats or attempted assaults; nor did she so advise Dr. Heyder during the hospitalization period at Norfolk General Hospital; and she concedes that her husband was "about as normal as usual" during his three home visits following August 31. One would assume that the wife is the logical person to convey such information. While the Court does not fully agree with Dr. Grissom that the physician-patient relationship is of such a confidential nature in mental cases as to preclude interrogation of a wife or relatives as to the past actions of a patient, we feel that with the prior treatment at Norfolk General Hospital by Dr. Heyder at which time no complaint was registered by the wife, plus the fact that the wife had full opportunity to discuss prior events with Dr. Stamps, any lengthy interrogation would have revealed nothing of value. Certainly the history obtained by the personnel of defendant's hospital was reasonably sufficient under the facts of this case, and there was no duty to go to other relatives where there is a wife who should have knowledge of all relevant facts.

Lastly, it should be pointed out that Eanes was at liberty to leave defendant's hospital at any time. He voluntarily entered the Veterans Administration Hospital. It is true that, under section 37–103 of the Code of Virginia 1950, Eanes, if found by two physicians to be in such a mental condition that it would be for his safety and benefit to receive proper hospital care and treatment, could have been received in a state hospital for the care and treatment of the mentally ill, and detained *temporarily* in said state hospital without a court order for a period not to exceed 45 days, following which Eanes would either be discharged, committed, or would voluntarily make application for further care and treatment. Even if Eanes had been adjudged as mentally ill, he could still be transferred to the Veterans Administration facility under section 37–73. However, we do not think this point to be of any consequence as there is nothing in the record indicating that Eanes was demanding his release or furlough. Virginia has provided by statute, section 37–135, for trial visits to homes, etc., in the care of a relative, friend, or other responsible or proper person.

In the final analysis, this case turns on the acceptance or rejection of the "open door" policy prevailing in institutions caring for the mentally disturbed patient. When the Circuit Court of Appeals for the Fourth Circuit affirmed this court's decision in White v. United States, supra, it made no mention of the "open door" policy referred to by this court in 244 F.Supp. 127, although it said, "While the issue would be highly debatable if before us de novo, we find no reversible error in the record." As in *White*, the ultimate decision rested in an approval of the "open door" policy, even though there had been an error of judgment, it seems that *White* presented even a stronger case for recovery than in the present case where there can be no clear finding of an erroneous diagnosis. The authorities on the subject are collected and discussed in *White*. We can only reiterate what was said in Baker v. United States, 226 F.Supp. 129 (D.C. Iowa, 1964):

> "Calculated risks of necessity must be taken if the modern and enlightened treatment of the mentally ill is to be pursued intelligently and rationally. Neither the hospital nor the doctor are insurers of the patient's health and safety. They can only be required to

use that degree of knowledge, skill, care and attention exercised by others in like circumstances."

As this case essentially turns upon a matter of judgment, and as all physicians agree that the attending physician is in a better position to exercise this judgment, we find no negligence on the part of defendant's personnel.

Let a judgment order be prepared and presented after endorsement by counsel for plaintiff.