419 F.2d 704
 136 U.S.App.D.C. 122
 LUCY WEBB HAYES NATIONAL TRAINING SCHOOL FOR DEACONESSES AND
MISSIONARIES, etc., Appellant,
v.
Hilda J. PEROTTI, Administratrix of the Estate of William L.
Perotti, Deceased, Appellee.
 No. 21902.
 United States Court of Appeals District of Columbia Circuit.
 Argued Feb. 24, 1969.
Decided July 10, 1969.
 
 Messrs. John L. Laskey and Thomas Penfield Jackson, Washington, D.C., for appellant.
 Mr. John Jude O'Donnell, Washington, D.C., with whom Mr. Robert S. Bourbon, Rockville, Md., was on the brief, for appellee.
 Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge and LEVENTHAL, Circuit Judge.
 BAZELON, Chief Judge:
 
 
 1
 Early on a Sunday morning in January 1964, William L. Perotti plunged from the seventh floor of the Sibley Memorial Hospital, which he had entered the afternoon before as a psychiatric patient. Despite emergency treatment, he died later that morning. His widow, as the administratrix of his estate, obtained a jury verdict for $60,000 against the appellant corporation, which operates the hospital, under the District of Columbia wrongful death statute, 16 D.C.Code 2701-03 (1967).
 
 
 2
 The hospital argues that there was not sufficient evidence of negligence by its agents or employees to support a verdict against it. We reject this contention. Because the trial court incorrectly instructed the jury that a violation by the hospital of a 1909 municipal regulation governing the maintenance of hospitals would constitute negligence per se, however, we reverse the judge and remand for a new trial.
 
 
 3
 * Until the spring of 1963, the deceased led a quiet life with no hint of mental illness, so far as the record reveals. Married and the father of two young boys, he worked as a cartographer for the Army Map Service. In April or May of that year, however, he applied for an intra-agency transfer and, as part of that process, took a polygraph test. Vague but terrifying fears concerning the results settled upon his life. He had trouble sleeping and withdrew from social activities. His appetite disappeared, and by the end of the summer he had lost 25 pounds.
 
 
 4
 Mr. Perotti's wife, concerned for his health, suggested a check-up from their family physician, who in turn recommended consultation with a psychiatrist. The deceased made an appointment with a Dr. Santucci, who concluded that he 'could best be treated in a hospital setting.' Mr. Perotti accepted this advice, and that same evening, September 3, 1963, entered Ward 7-W, the psychiatric wing at Sibley Memorial Hospital.
 
 
 5
 At the time of this first admission, Dr. Santucci tentatively diagnosed the deceased's condition as a 'paranoid depression.' The initial treatment plan included a type of tranquilizer that normally produced its best results three or four weeks after therapy began. Mr. Perotti, however, became impatient before then and evinced a great interest in going home and returning to work. At that time Dr. Santucci strongly favored further hospitalization, and went so far as to prepare the physician's certificate necessary to commit Mr. Perotti involuntarily to an institution in Maryland, where he resided. This certificate, which eventually became part of the patient's hospital records, indicated that Mr. Perotti was at that time suicidal. Regarding his general mental condition, Dr. Santucci noted,
 
 
 6
 Patient is depressed and preoccupied with feelings of guilt, apathetic, has slowness of speech, has marked feelings of guilt for vague past actions, lies in bed all day; delusions of persecution at work.
 
 
 7
 Both Mr. Perotti and his wife were opposed to commitment, however, and the patient began to show some improvement, apparently because of the drug therapy. For either or both of these reasons, Dr. Santucci pursued the commitment matter no further. But since he felt that Mr. Perotti's improvement was somewhat superficial, leaving the underlying illness uncured, he still favored further hospitalization at Sibley.
 
 
 8
 On September 26, 1963, Dr. Santucci discharged Mr. Perotti as 'improved * * * but not fully recovered.' Although the plaintiff testified in her deposition that this discharge was not against Dr. Santucci's advice, his discharge note in the patient's record stated, 'He is being discharged under my protest but he is not so ill as to be committable.'
 
 
 9
 Mr. Perotti returned to work that fall, resumed his social activities and regained some of his lost weight. Early in January 1964, however, his medication ran out and he did not renew the prescription. After several days of normal activity, he became 'very quiet,' according to his wife, and was abnormally affectionate toward his family. The family physician again referred Mrs. Perotti to Dr. Santucci. An appointment was made for the following week. Two days later, however, Mr. Perotti collapsed while hailing a neighbor from his front door. Although he recovered quickly, Mrs. Perotti called Dr. Lertora, who was covering Dr. Santucci's practice since he was away from town that weekend on professional business. Dr. Lertora spoke with Mr. Perotti over the telephone, found his speech to be 'very slow' and 'very depressed,' and suggested he return to the hospital. Mr. Perotti agreed, and reentered the psychiatric wing of Sibley Memorial Hospital early that afternoon, a Saturday.
 
 
 10
 Dr. Lertora, who did not see the patient personally, advised the nurse in charge of Ward 7-W to administer only sleeping medication and to keep Mr. Perotti under observation. As on his first admission, and as was customary with new patients generally, Mr. Perotti was admitted to the closed portion of the psychiatric wing, which was separated from the front or open section reserved for less disturbed patients by a solid door that was kept locked. He spent a quiet afternoon talking with his wife when she visited. The psychiatric technician who filled out the evening reports noted that he was chain-smoking and non-communicative and refused to eat.
 
 
 11
 Early the next morning Mr. Perotti asked a technician whether he could go to the open side. The technician told him that the hospital regulations required him to stay in the closed section until his physician gave orders to the contrary. Shortly thereafter, a nurse observed him standing in the corridor in the open section. Although no one testifying at the trial quite knew how he got there, the most obvious possibility suggested was that he had slipped through while the normally-locked door was open to permit the food cart carrying breakfast to enter the closed section.
 
 
 12
 The nurse asked a psychiatric technician to return Mr. Perotti to the proper section. When the technician reached the patient, who by then had walked to the solarium or living room at the far end of the corridor, Mr. Perotti cooperated and began walking back to the closed section. After the two had walked some ten paces side-by-side, however, Mr. Perotti wheeled and ran back toward the solarium. Before the technician could catch up, he dived through the window.
 
 
 13
 The window in the solarium, the main portion of which was four and one-half by five feet, was one-quarter inch laminated safety glass. Like the bedroom windows in both sections of the psychiatric wing, which were also safety glass, it was unbarred. Since the hospital sought to create an open, unrestrictive atmosphere wherever possible in the ward, only the windows in the two seclusion rooms reserved for very seriously disturbed patients and a window at the end of the corridor in the closed section were grated. The seclusion-room windows had Chamberlin screens securely seated in the masonry of the wall which not even a powerful man could dislodge; the window at the end of the corridor had an ornamental screen of unspecified design.
 
 II
 
 14
 Although the plaintiff made numerous allegations of negligence against the hospital, she relied principally upon the failure of the hospital to place stronger glass in its windows that would prevent patients from crashing through, and upon the carelessness of the hospital personnel in allowing Mr. Perotti to slip from the closed to the open section of the ward. The plaintiff also submitted as evidence of negligence a municipal regulation dealing with the confinement and care of 'delirious or maniacal' patients; this aspect of the case will be considered in Part III.
 
 
 15
 The hospital, in arguing the insufficiency of the evidence to support a verdict against it, devotes a sizable portion of its brief to a description of modern trends in caring for the mentally ill. The pendulum has swung, we are told, from a philosophy of resigned despair which viewed the mentally ill as hopeless, helpless victims of their affliction. The sprawling, isolated public institutions spawned by that philosophy are relics of attitudes that society and the psychiatric profession have now outgrown-- that the mentally ill could be cared for but not cured; that physical restraints were the necessary response to psychic distress; that the sick should be out of sight, where they could neither contaminate nor inconvenience the well.
 
 
 16
 Today the goal is not to confine the mentally ill, however benevolently, but to enable them to function in the community. Accordingly, institutionalization is regarded as the exception rather than the standard response. Since mental illness often springs partly or wholly from social pressures and family tensions, many experts argue, quite plausibly, that treatment should occur within or at least close to the community and the family.
 
 
 17
 The mental hospital functions in this new model as a repair shop rather than as a human junkyard. Confinement and physical restraint are no longer the defining qualities of hospitalization. Since the emphasis is upon treatment, the atmosphere of the hospital should encourage recovery by allowing the patient to assume progressively greater and greater responsibility.
 
 
 18
 Since confinement and restraint may deny the patient the sense of responsibility and self-control essential to his recovery, the argument runs, limitations upon his freedom of movement are appropriate only when necessary for the safety of the patient or others. And since the restraint required for absolute safety may be inconsistent with effective therapy, calculated risks must sometimes be taken.
 
 
 19
 For example, an important aspect of treatment may be exposure to carefully controlled social pressures and frustrations. The greater liberties of movement and action which reward the patient for successful responses to these challenges may motivate him toward further improvement. Equally important, his ability to cope with smaller-than-life-sized crises within the hospital helps convince the patient and his physicians that he will be able to resume life outside the hospital.
 
 
 20
 Real challenges and real responsibility for the patient imply the risk of real failures, however. Some patients will prove unready for responsibility, and may injure themselves or others. In a real sense these failures are the inevitable cost of any treatment program oriented toward returning patients to the community. But the law nevertheless must allocate at least the economic losses occasioned thereby. The critical question is what standards should govern this allocation.
 
 
 21
 The implicit punch line to the hospital's long story of changing concepts toward mental illness is that courts should not discourage innovations in treatment by applying standards of reasonable care which reflect attitudes now discarded in the psychiatric world concerning the sort of confinement and restraints necessary for mentally ill patients. While this observation is unimpeachable as a general proposition, its utility as a guide to decision in this case is unclear. Although the appellant advances a number of decisions from other jurisdictions to support the amorphous argument that courts 'display increasing leniency toward the new hospital techniques,' the correct principle certainly cannot be that courts should always absolve hospitals of responsibility when mental patients run amuck.
 
 
 22
 The hospital does not propose this solution, however, nor even explicitly advance what seems the more likely intended hint, that courts should view the undoubted problems of mental health administration sympathetically in these cases. After discussing the history of mental institutions and itemizing the numerous recent cases in which mental hospitals have escaped liability, the appellant proceeds to its strictly legal argument in this case: that a showing of negligence could only rest upon expert testimony, which the plaintiff failed to produce, that the hospital did not care for Mr. Perotti with the 'skill and diligence customarily exercised by hospitals generally in the community.'[1]
 
 
 23
 Insofar as the plaintiff relied upon the hospital's failure to have stronger window glass to establish negligence, we find merit in the hospital's argument. The architect of the hospital and the leading psychiatrist who helped plan the psychiatric ward both testified that a conscious decision was made when the hospital was built not to place bars or metal screens over any windows except those in the two seclusion rooms. Since the emphasis in the new ward was to be upon therapy rather than confinement, they wished to create an open, pleasant atmosphere to the fullest extent possible. In their opinion at the time, safety glass provides adequate protection to prevent patients from leaping out the windows.
 
 
 24
 The plaintiff produced no expert testimony to demonstrate that this decision was unreasonable. A Mr. Lamont, an architectural representative for the firm that supplied the glass the hospital used, did testify that other stronger types of glass were available when the hospital was built. He stated that the primary attribute of safety glass was not added strength, but simply the fact that it would not shatter when broken. Tempered glass, on the other hand, was several times stronger than safety or regular glass of the same thickness. Other types of laminated glass or the very thick bulletproof glass sometimes used in banks could have been installed, although the witness suggested that these alternatives were relatively impracticable.
 
 
 25
 The hospital authorities had testified that they rejected tempered glass because their understanding at the time was that it would completely shatter if the surface was scratched. Mr. Lamont, however, stated that a scratch would have to be relatively deep in order to affect tempered glass in this fashion-- for glass half an inch thick, a scratch would need to be about three thirty-seconds of an inch deep.
 
 
 26
 The most that the plaintiff demonstrated by this testimony, however, was that other decisions were possible in selecting glass for the windows of the psychiatric ward, and that the actual choice of safety glass may have rested in part upon a misapprehension of the properties of tempered glass. But neither Mr. Lamont nor any other witness testified concerning the sort of glass installed in other psychiatric wards built at roughly the same time as the ward in Sibley Memorial Hospital.
 
 
 27
 In deciding upon the design of Ward 7-W, the planners of the hospital had to balance the risk of patient suicides against the antitherapeutic impact of devices that could prevent suicides only at the cost of reminding patients that they were considered incapable of assuming full responsibility for their own behavior. The jury could not assess the reasonableness of the decision reached without an understanding of the risk of suicide among mental patients, the best methods of preventing suicide-- whether by physically restraining the suicidal patient or by treating the illness which made him suicidal-- and the importance of an open, unrestrictive environment for treatment.
 
 
 28
 These were all matters beyond the common sense understanding of laymen unversed in psychiatry. The jurors in this case could not be expected to determine whether the hospital decision to install safety glass was within the zone of reasonableness without the assistance of expert testimony addressed to these issues and to the precautions for patient safety which other psychiatrists of reasonable prudence would consider necessary.
 
 
 29
 Since the plaintiff did not introduce any expert evidence on these matters, a verdict resting only upon the hospital's allegedly negligent use of safety glass could not be allowed to stand. But the plaintiff did not rely only upon the design of Ward 7-W to establish negligence. A critical part of the plaintiff's case was that Mr. Perotti committed suicide only after straying from the closed to the open section of the ward.
 
 
 30
 At least two witnesses testified for the hospital that patients were placed in the closed section to permit closer observation of their conduct and to prevent them from disturbing less seriously ill patients rather than to minimize the risk of suicides. But there was evidence, such as the restrictions upon patients' possessing sharp objects in the closed section and the placement of an ornamental metal screen over the window at the end of the corridor in the closed section, that strongly suggests that greater safety precautions were at least an effect if not a purpose of confinement on the closed section.
 
 
 31
 The plaintiff introduced no expert testimony that reasonable prudence by hospital staff members would prevent mental patients from leaving the closed ward unattended. But our cases have indicated that expert testimony is not an invariable requirement to establish negligence by a hospital. Some issues do not involve questions of medical judgment; in other cases gross defects in medical judgment may allow jurors to find negligence without the guidance of expert testimony.[2] Sometimes, moreover, the plaintiff may establish standards of professional conduct against which the jury can measure the facts of a particular case in other ways than by introducing expert testimony.[3]
 
 
 32
 In the present case, the plaintiff sought to show that the hospital itself had established the appropriate standard of care-- i.e., that patients on the closed ward should not be allowed to wander to the open section-- and then fallen short of its own standard. To this end both Mrs. Perotti and the neighbor who drove to the hospital on the morning of the tragedy testified that Dr. Lebensohn, the chief of psychiatry at the hospital, told them, 'This should not have happened. The door was left open when they were serving breakfast trays; it is a lot of trouble * * * closing that door in the back section.'
 
 
 33
 There was testimony, moreover, that a nurse was normally at the nursing station adjacent to the door separating the open and closed portions of the ward, although there was some dispute whether supervising patients moving from the closed to the open section was a primary or merely an incidental duty of whoever was at the nursing station. The plaintiff also introduced as exhibits various internal hospital directives concerning policies and procedures for Ward 7-W, which dealt among other things with the requirement that a staff member accompany a closed-section patient when he went to the open section or elsewhere in the hospital.
 
 
 34
 We think the jury could find negligence upon the part of the hospital from this evidence without the assistance of expert testimony. The jurors might not be able to determine the necessity for a closed ward for mental patients of the type admitted to Ward 7-W, nor to evaluate the need for restrictions upon the movement of patients into and out of the closed ward. But the hospital itself had made these decisions. It could, of course, have presented evidence that the limitations upon patient movement constituted more than due care, or were unrelated to patient safety. Indeed, witnesses did testify for the hospital that the open and closed wards were separated by a locked door chiefly, or only, to isolate the more disturbed patients from those not so acutely ill. On the basis of all the evidence, however, the jury could reasonably conclude that the hospital's failure to observe the standards it had itself established represented negligence.
 
 
 35
 This was not a case where a determined patient managed to commit suicide in a mysterious or unexpected fashion.[4] Nor is this a case where a calculated risk was taken for therapeutic reasons with a patient of known suicidal tendencies,[5] nor where a hospital had concluded after examination that a patient was not suicidal and hence did not require precautions.[6]
 
 
 36
 The hospital records contained the certificate completed by Dr. Santucci when Mr. Perotti was first a patient four months earlier which indicated that he was then suicidal. These records were locked up on the Saturday when Mr. Perotti was readmitted in January, however, and no one examined these records before his suicide the next morning. Nor did any physician apparently see Mr. Perotti between the time when he was admitted and his leap from the seventh floor window. Dr. Lertora, who recommended readmission in Dr. Santucci's absence, did not go to the hospital on Saturday. The psychiatric resident who worked on Ward 7-W during the week was not in on the weekend.
 
 
 37
 No one suggests, at least to us, that the hospital was negligent in failing to have a psychiatric examination made of Mr. Perotti at the time he was admitted, or to make the records of his previous hospitalization available for the staff members charged with his care and supervision. But since neither of these possible steps were taken, the hospital was dealing with a new patient who was, in effect, an unknown quantity. The jury could properly consider this factor in determining whether the hospital displayed reasonable prudence in allowing him to wander unattended into the open section.
 
 
 38
 The hospital argues that even if it was negligent in permitting this to happen, its negligence was not a proximate cause of his suicide since he had been apprehended by a staff member who was accompanying him when Mr. Perotti bolted back to the solarium and through the window. Since the hospital procedures provided for the movement of closed-ward patients to other parts of the hospital when accompanied by an attendant, the hospital claims that the risk created by its negligence ended when he was apprehended.
 
 
 39
 The fact that the hospital customarily allowed closed-ward patients to move about when properly accompanied does not demonstrate either that this was a totally riskless procedure or that the hospital considered such movement riskless, however. The jury might have concluded that the hospital took a calculated and justifiable risk in allowing a patient to travel from the closed ward to, say, one of the treatment rooms which were located in the open section. But Mr. Perotti was not out of the closed section for any such valid purpose even when he was in the custody of the psychiatric technician who apprehended him. Whether attended or not, he was in the open section only because he had strayed there upon his own initiative. We believe that the jury could reasonably find that if the hospital was negligent in allowing him to slip through the normally-locked and guarded door to the closed ward, this negligence was a proximate cause of his subsequent successful effort to take his own life.
 
 III
 
 40
 Although we find that there was sufficient evidence to support a verdict against the hospital, the judgment must be reversed for another reason. At the request of the plaintiff, and over the objection of the defendant, the trial judge instructed the jury that
 
 
 41
 At the time this incident * * * occurred, there was in force and effect in the District of Columbia, regulations to govern the establishment and maintenance of private hospitals and asylums. One of these regulations was as follows: 'No person, being the owner or superintendent or employee of any private hospital or asylum shall permit any delirious or maniacal patient or any patient who may reasonably be expected soon to become delirious or maniacal to remain in any room that is not properly barred or closed so as to prevent the escape of such patient or accident or injury to him unless such patient is in the actual physical presence of an attendant capable of controlling and restraining him.' * * * If the Jury does believe that Mr. Perotti was a patient described in the regulation, then you are told that the regulations set out the applicable standard of care required by one in the same situation as the hospital, and in that event that the violation of the regulation if any, by the hospital, is negligence.
 
 
 42
 This instruction that violation of the regulation would constitute negligence per se rested upon our decision in Ross v. Hartman.[7] In that case, the defendant's agent had violated a District of Columbia traffic ordinance by leaving a vehicle on a public street unlocked and with the key in the ignition. The truck was stolen, and the thief ran over the plaintiff. Finding that the plaintiff was a member of the class for whose protection the ordinance had been enacted, we held that the defendant's violation constituted negligence per se.
 
 
 43
 The appellant argues that a 1909 regulation should not be allowed to establish the standard of care for mental patients in 1964.[8] We have considerable sympathy for this argument. As the language of the ordinance indicates, this regulation for the care of 'delirious or maniacal' patients rests upon a dated view of proper mental hospital administration. Although the regulation is still technically in effect, it scarcely reflects the contemporary philosophy regarding the mentally ill.
 
 
 44
 We do not find it necessary to decide whether an exception should be read into the doctrine announced in Ross v. Hartman for cases where a municipal ordinance is old and outmoded. The traffic ordinance in Ross was one directed straight to the motoring public, who were expected to know and heed its requirements. In this case, the regulation related to the licensing of private hospitals in the District of Columbia.
 
 
 45
 The Department of Public Health, which apparently is responsible for the enforcement of the regulation involved, approved the design of Sibley Memorial Hospital, including Ward 7-W, and recommended that the Commissioners of the District of Columbia license its operation, which they did. The situation thus resembles that in Hecht v. McLaughlin,[9] where the plaintiff asserted that the defendant store had violated a municipal regulation providing that doors should not swing into passageways. We noted that 'there is unequivocal evidence that the Company obtained the approval of public and architectural authorities before installing this door * * *,' and went on to conclude:
 
 
 46
 This is indicative of care on the Company's part quite inconsistent with the theory that violation of the regulation alone, all else aside, is negligence as (a) matter of law. To apply this doctrine to the facts of this case would be essentially unfair.[10]
 
 
 47
 The same reasoning applies to this case. Regulations relating to a licensing process are often enacted with the reasonable expectation that the licensing authority will exercise some judgment in applying the general rule to the specific case. To invoke a doctrine of negligence per se in such circumstances robs the regulation of the flexibility that its draftsmen may well have envisioned for it. We conclude that in this case the instruction that violation of the regulation would be negligence per se was erroneous, and requires a new trial. The correct standard, as enunciated in McLaughlin, is that the hospital's negligence should be 'decided on all relevant evidence, including violation of any safety regulation found to be applicable, and consequently admissible in evidence, but including also facts tending to show due care'[11] on the part of the hospital in the construction and operation of Ward 7-W.
 
 
 48
 Since a new trial will be required, several further observations concerning the proper treatment of the regulation are in order. As part of its defense, the hospital called the chief of the engineering division of the Department of Public Health, who occupied a subordinate position in the division at the time the department approved the hospital. Over the objection of the plaintiff, he testified that 'To the best of my knowledge, (the department) * * * didn't regard (the regulation as) * * * any obstacle' in granting an occupancy permit to the hospital. The stated objective of the defense counsel, as expressed at a bench conference, was to elicit testimony 'that this (regulation) * * * is an obsolete standard and they don't regard it as determinative of the proper standard of care today * * *.' For reasons that are not clear, however, this precise question was not put to the witness.
 
 
 49
 We regard this inquiry as relevant, but do not agree that the jury was the proper agency to resolve the question of what force this regulation has today, if any. As we made clear in McLaughlin, the trial court must determine whether a regulation is applicable to the case at hand before admitting it into evidence. We did allow for the possibility there that 'in some such situations the trial court might appropriately permit the question of application, and accordingly that of admissibility, to turn upon jury resolution of disputed factual issues * * *.'[12] This novel approach to determining the admissiblity of evidence might be justified upon occasion by the difficulty of separating the questions of whether a regulation is 'applicable' and whether, if applicable, it has been 'violated.'
 
 
 50
 But that is not the situation here. If the Department of Public Health regards the regulation as outmoded, and has not considered its provisions in licensing hospitals, the proper conclusion is that the regulation is not applicable to this case. The hospital could encounter the regulation only in the licensing process; if the Department of Public Health has ignored its requirements, the hospital has not come under the regulation's sway, and consequently the question of its violation cannot arise.
 
 
 51
 This case, it should be noted, does not present a question of desuetude in the formal sense. The inquiry rather is what guidance if any this regulation may provide in determining the standard of care in a private dispute. Since this is so, to conclude that the regulation was inadmissible the trial court would not need to decide that the Department of Public Health could not, if it wished, invoke the regulation to deny a license. On this score, enforcement agencies have wide discretion when to apply statutes or regulations, and courts are notoriously reluctant to find that statutes, and to a lesser degree regulations, have fallen into desuetude from mere disuse.
 
 
 52
 The question instead is whether an administrative policy of ignoring the regulation in granting licenses should render it inapplicable, and hence inadmissible, in a private dispute. To answer this question in the affirmative, the trial court would not need to decide that the Department of Public Health could not enforce the regulation if it wished, but merely that the past policy of nonenforcement should remove the regulation from consideration in determining whether the hospital exercised due care.
 
 
 53
 We cannot and need not determine from this record whether there has indeed been any such policy of nonenforcement. Rather than ignoring the regulation as obsolete, the Department of Public Health may have construed its provisions in such a way as to permit the grant of a license to Sibley Hospital. The department might, for example, have concluded that the words 'delirious or maniacal' referred only to such acutely disturbed patients as would be confined to the two seclusion rooms, the windows of which were barred. Alternatively, since the regulation forbids the use of rooms with unbarred windows 'unless (the delirious or maniacal) * * * patient is in the actual physical presence of an attendant capable of controlling and restraining him,' the Department might conceivably have interpreted the regulation to pertain to the operation of the hospital rather than to its design.
 
 
 54
 The parties will undoubtedly pursue these inquiries if the plaintiff attempts to introduce the regulation at a new trial. If the trial court decides that the regulation was not ignored in the licensing process, and hence that it is applicable to this case and therefore admissible into evidence, the defense will of course be entitled to introduce evidence relating to the construction placed upon it by the department in deciding to grant a license to the hospital. As we pointed out in McLaughlin, 'where the language of an ordinance or regulation is doubtful and open to different interpretations the construction placed upon it by the department charged with its execution will generally control.'[13] In the case of a regulation framed in such archaic terms as 'maniacal and delirious,' proper guidance as to its contemporary interpretation by those entrusted with its enforcement is doubly essential if the jury is to consider its provisions in determining whether the hospital exercised due care.
 
 
 55
 So ordered.
 
 
 
 [1]
 Garfield Memorial Hosp. v. Marshall, 92 U.S.App.D.C. 234, 239, 204 F.2d 721, 725, 37 A.L.R.2d 1270 (1953)
 
 
 [2]
 See, e.g., Washington Hosp. Center v. Butler, 127 U.S.App.D.C. 379, 384 F.2d 331, 335-337 (1967)
 
 
 [3]
 See Monk v. Doctors Hosp., 131 U.S.App.D.C. 174, 177, 403 F.2d 580, 583 (1968)
 
 
 [4]
 See, e.g., Sklarsh v. United States, 194 F.Supp. 474 (E.D.N.Y.1961); Hirsch v. New York, 8 N.Y.2d 125, 202 N.Y.S.2d 296, 168 N.E.2d 372 (1960)
 
 
 [5]
 See, e.g., Baker v. United States, 226 F.Supp. 129 (D.Iowa 1964), aff'd, 343 F.2d 222 (8th Cir. 1965); Schwartz v. United States, 226 F.Supp. 84 (D.D.C. 1964); Shockey v. Washington Sanitarium, 223 Md. 554, 165 A.2d 764 (1960); Zilka v. State, 52 Misc.2d 891, 277 N.Y.S.2d 312 (Ct.Cl.1967); cf. Eanes v. United States, 280 F.Supp. 143 (D.Va.1968)
 
 
 [6]
 See, e.g., Dimitrijevic v. Chicago Wesley Memorial Hosp., 92 Ill.App.2d 251, 236 N.E.2d 309 (1968); Kardas v. State, 24 A.D.2d 789, 263 N.Y.S.2d 727 (1965); Rawdin v. Long Island Home, Ltd., 21 A.D.2d 909, 251 N.Y.S. 756 (1964), aff'd, 16 N.Y.2d 636, 261 N.Y.S.2d 76, 209 N.E.2d 118 (1965)
 
 
 [7]
 78 U.S.App.D.C. 217, 139 F.2d 14 (1944), cert. denied, Hartman v. Ross, 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080 (1944)
 
 
 [8]
 The challenged instruction was based upon Section 9 of certain 'Regulations to Govern the Establishment and Maintenance of Private Hospitals and Asylums,' which were first promulgated by the Commissioners of the District of Columbia on May 19, 1909, pursuant to the Hospital Licensing Act of 1908, ch. 148, 4, 35 Stat. 65, 32 D.C.Code 304 (1967)
 
 
 [9]
 93 U.S.App.D.C. 382, 214 F.2d 212 (1954)
 
 
 [10]
 Id. at 385-386, 214 F.2d at 215
 
 
 [11]
 Id. at 386, 214 F.2d at 215-216
 
 
 [12]
 Id. at 385 n. 4, 214 F.2d at 215 n. 4
 
 
 [13]
 Id. at 384-385, 214 F.2d at 214