699 P.2d 925

Catherine GREGG, surviving wife of Donald Gregg, Plaintiff/Appellant,

v.

NATIONAL MEDICAL HEALTH CARE SERVICES, INC.; Gila General Hospital; Gila General Hospital Board of Directors; and Gila County, Defendants/Appellees.

No. 2 CA–CIV 5140.

Court of Appeals of Arizona, Division 2.

March 12, 1985.

Meyer, Vucichevich & Cimala, P.C. by P. Richard Meyer, Robert A. Jensen, P.C. by Robert A. Jensen, John S. Schaper, Phoenix, for plaintiff/appellant.

Fennemore, Craig, von Ammon, Udall & Powers by Nancy L. Rowen and J. Gregory Osborne, Phoenix, for defendants/appellees.

## OPINION

HOWARD, Judge.

Appellant sued, inter alia, Gila General Hospital, Dr. McLaren Ruesch and Dr. Anthony Forte, alleging that the hospital's independent negligence and/or the negligence of Drs. Ruesch and Forte caused her husband to die of a heart attack. The hospital moved for summary judgment on the grounds that any independent negligence on its part was not a proximate cause of Donald Gregg's death and that neither Drs. Ruesch nor Forte were agents or employees of the hospital. The trial court granted appellees' motion.

Gila General Hospital, located in the Globe-Miami area, is owned by Gila County and is managed by National Medical Health Care Services, Inc. On August 1, 1979, Gregg went to the emergency room of the

hospital at 3 a.m. after having three episodes of crushing substernal chest pain accompanied by nausea and vomiting. The emergency room physician diagnosed a possible heart attack, administered an electrocardiogram (EKG) and admitted Gregg to the intensive care unit.

Dr. McLaren Ruesch, a family practitioner who had staff privileges at the hospital, was Gregg's attending physician. He asked Dr. Anthony Forte, a cardiologist from Tucson with staff privileges at the hospital, to see Gregg in consultation. Dr. Forte examined Gregg and interpreted the EKG tracing taken in the emergency room. He found the tracing to be normal. He thought Gregg's pains might have been caused by esophagitis (inflammation of the esophagus) with spasms or beginning pericarditis (inflammation of the membrane around the heart). Dr. Forte thought that it was unlikely that Gregg had suffered a myocardial infarction (death of the heart muscle). Dr. Forte ordered daily EKGs and he did not see Gregg again.

The next day, after reading the August 2 EKG, Dr. Ruesch moved Gregg from the intensive care unit, ruling out a myocardial infarction as the cause for Gregg's August 1 chest pains. On August 3, after reviewing the third EKG tracing, an additional laboratory report, and x-rays of the gastrointestinal tract which revealed the existence of a hiatal hernia, Dr. Ruesch advised Gregg that the probable cause of his pain was the hiatal hernia. However, because Gregg's family history demonstrated a proclivity for coronary problems, Dr. Ruesch advised Gregg that he might have coronary artery disease and made an appointment for him with Dr. Forte for treadmill testing, angiographing, and any other testing which Dr. Forte felt was indicated.

Gregg's August 2 and 3 tracings were mailed by the hospital to Dr. Forte's office in Tucson. They arrived on August 7 and were read by Dr. Forte that day. Though there were some changes in the tracings, Dr. Forte did not believe the changes were medically significant and called his report into the hospital for transcription into Gregg's chart.

On August 8 and 9 Gregg again experienced severe chest pains and on August 9 he collapsed at home and was pronounced dead on arrival at the hospital. The autopsy report indicated that Gregg had suffered from extensive heart disease and concluded that he died of a massive myocardial infarction.

The record shows that Dr. Forte had been going to Globe since November 1973. The hospital needed a cardiologist to run the cardiac clinic and to act as a consultant to the doctors for patients who were in the hospital. They paid him $300 per week to visit once a week. He was the only cardiologist with staff privileges at the hospital. He was also paid seven to ten dollars each for interpreting the cardiograms. When he went to the hospital he stayed there for approximately five hours. Dr. Forte did not go to Globe when he was on vacation or when he had to go to a medical meeting. When he was away from his office in Tucson and could not interpret the cardiograms, he had one of his colleagues in Tucson do so. In order to have staff privileges at the hospital he had to show proof of malpractice insurance, which insurance he paid for himself. The hospital billed the patients that he saw there and in turn paid the money to Dr. Forte.

For the purposes of the summary judgment only, both sides conceded negligence on the part of Drs. Forte and Ruesch. In resisting the hospital's motion for summary judgment, appellant contended that the hospital was liable on two grounds: first, that Dr. Forte was an employee or agent of the hospital, thus subjecting it to liability based upon the doctrine of respondeat superior and, second, that the hospital was independently negligent for its failure to establish appropriate rules and regulations concerning the care and treatment of suspected cardiac patients.

I.

On the issue of the independent negligence of the hospital, in opposing the mo-

tion for summary judgment, appellant relied on the affidavit of Dr. Abraham J. Kauver. He had extensive experience in the field in the enactment of hospital rules, regulations and protocols. It was his opinion that the care given by the hospital was substandard because it had failed to adopt regulations or protocols which would have required daily and/or immediate transmission, reading and reporting by cardiologists of electrocardiograms on patients presenting signs and symptoms of acute coronary artery disease and requiring the transmission of the opinions of such cardiologists to the treating physician on a daily basis.

Dr. Kauver further believed that the conduct of the hospital was substandard by not providing regulations and protocols for the referral of patients presenting signs or symptoms of acute coronary disease to other facilities and/or to specialists properly skilled and trained to deal with such problems.

■ Dr. Kauver did not state anywhere in his affidavit that the failure of the hospital to adopt these rules, regulations and protocols was the proximate cause of Gregg's death. Ordinarily, expert medical testimony is required to establish proximate cause and make out a prima facie case of medical malpractice unless a causal relationship is readily apparent to the trier of fact. *Monahan v. Weichert,* 82 A.D.2d 102, 442 N.Y.S.2d 295 (1981). In order to establish a prima facie case of medical malpractice in the case sub judice it was necessary for appellant to establish, by expert medical opinion, that there was a causal connection between the lack of rules, regulations and protocols and Gregg's death. See *Monahan v. Weichert,* supra, where the court held that the trial court was correct in dismissing appellant's action against appellee hospital because there was

no expert medical testimony establishing a causal link between the hospital's alleged failure to keep proper medical records on the patient and his injuries.

■ The record here shows that Gregg was in fact referred to a cardiologist and that the cardiologist read Gregg's x-rays two days prior to the time Gregg died. The record shows that even if the hospital did have rules, regulations and protocols requiring immediate reading and the immediate rendering of an opinion to the attending physician, nothing different would have occurred since Dr. Forte did not believe there were any significant abnormalities in the EKGs. Furthermore, Dr. Gordon Ewy, a cardiologist, reviewed the records in this case and testified in his deposition that in his opinion he had no reason to believe, based upon his review of the matter, that any delay which occurred in transmitting the EKG reports to Dr. Forte caused or resulted in the patient's death. This lack of medical testimony on the issue of causation rules out the imposition of liability based on independent negligence.

### II.

■ The vicarious liability of the hospital, based on Dr. Forte's alleged negligence, presents a different matter. Appellant contends that Dr. Forte, negligent in his initial diagnosis of Gregg and in his failure to properly interpret the EKGs which were sent to him, was an employee or agent of the hospital. Appellees contend that Dr. Forte was an independent contractor.[1]

■ We start with the observation that the fact that a physician or surgeon is on a hospital staff does not necessarily make him an employee of that hospital. *Evans v. Bernhard,* 23 Ariz.App. 413, 533 P.2d 721 (App.1975).[2] Dr. Forte was called into consultation by Dr. Ruesch, the attend-

1. For the first time in her reply brief appellant also relies on an ostensible agency theory. See *Adamski v. Tacoma General Hospital,* 20 Wash. App. 98, 579 P.2d 970 (1978). We refuse to consider this theory since it was advanced for the first time in the reply brief. See *Associated*

*Grocers v. Industrial Commission of Arizona,* 133 Ariz. 421, 652 P.2d 160 (App.1982).

2. For cases generally dealing with the liability of a hospital for the neglect of a doctor see Annot., 69 A.L.R.2d 305–339 (1960).

ing physician. Generally in such a situation the consulting doctor is an independent contractor. See *Mayers v. Litow*, 154 Cal. App.2d 413, 316 P.2d 351 (1957). See also Annot., 69 A.L.R.2d 325–26 (1960). However, where a doctor employed by the hospital commits an act of malpractice, the hospital may be derivatively liable under the doctrine of respondeat superior. *Beeck v. Tucson General Hospital*, 18 Ariz.App. 165, 500 P.2d 1153 (1972). In *Beeck* we held that an employer-employee relationship existed between Dr. Rente, a radiologist, and the hospital. While we rejected the notion that because the hospital had no license to practice medicine and could not control the performance of professional acts, it could not be held liable, we did not hold that when liability was based upon respondeat superior that the right to control was not a primary factor to consider. In fact, in *Beeck* we set forth the facts which show that the hospital did in fact have the right to control Dr. Rente's conduct. We adhere to the notion that the hospital cannot be held liable, except under the theory of ostensible agency, unless it had the right to control the conduct of the alleged servant-physician. See *Simmons v. St. Clair Memorial Hospital*, 332 Pa. Super. 444, 481 A.2d 870 (1984).[3] See also Annot., 69 A.L.R.2d, 333–336 (1960).

**3.** A physician may also be an agent of the hospital if his duties invoke a general administration of the hospital and giving treatment therein.

Here, Dr. Forte was paid $300 per week to commute from Tucson to the clinic to act as a consultant. In his deposition, Dr. Forte called this sum a "salary." This relationship had been going on for quite a while and one may infer from the evidence that except for vacation time and for medical meetings, he was required to be at the hospital at least one time per week. This cardiac consultant service was furnished by the hospital through Dr. Forte. Summary judgment should not be granted where there is the slightest doubt as to essential facts. *Fremming Construction Co. v. Security Savings & Loan Association*, 115 Ariz. 514, 566 P.2d 315 (App.1977). We believe that these facts show that there was a jury question as to whether or not Dr. Forte was in fact an independent contractor or was a part-time employee, thus precluding summary judgment.

Reversed and remanded for further proceedings consistent with this opinion.

BIRDSALL, C.J., and HATHAWAY, J., concur.

See *Simmons v. St. Clair Memorial Hospital*, supra.