765 P.2d 525

**Anthony J. PEACOCK,
Plaintiff–Appellant,**

**v.**

**SAMARITAN HEALTH SERVICE, dba
Good Samaritan Medical Center, a
corporation, Defendant–Appellee.**

**No. 1 CA–CIV 8968.**

Court of Appeals of Arizona,
Division 1, Department A.

April 28, 1988.

Review Denied Jan. 17, 1989.

**124**

Arthur M. Johnson, Vern E. Gasser, Phoenix and Oplinger & Gamble by Richard H. Oplinger, Kenneth J. Januszewski, Douglas H. Fitch, Tempe, for plaintiff-appellant.

Weyl, Guyer, Macban & Olson, P.A. by Thomas G. Bakker, Michael L. Barth, Phoenix, for defendant-appellee.

## OPINION

BROOKS, Judge.

This is an appeal from a summary judgment entered in favor of the defendant hospital in a medical malpractice action. We reverse.

### FACTS

In March of 1984, plaintiff-appellant Anthony Peacock was involved in an automobile accident and incurred minor injuries. When he failed to report to work a few days later, his fellow employees, Richard Schrier and Fred Stevens, became concerned and searched him out. When they arrived at Peacock's apartment, he answered the door in the nude and made bizarre remarks including the statement that he was "still alive." The room was dark and unkempt; there was a large burned spot on the carpet and a hunting rifle was lying on the floor. A bedroom window had been broken.

Fearing that Peacock might be suicidal and in need of medical care, Schrier and Stevens decided to take him to Desert Samaritan Hospital, a branch of Samaritan Health Service. Once there, Stevens and Schrier described Peacock's behavior to the admitting nurses and to the emergency room physician. After examining Peacock, the decision was made to admit him to the hospital. However, since there was no appropriate bed space available at Desert Samaritan, Schrier was asked to take Peacock to another of Samaritan's facilities, Good Samaritan Medical Center.

Upon their arrival at Good Samaritan, Schrier described Peacock's bizarre behavior to James Hicks, M.D., a psychiatrist. Dr. Hicks asked him if he thought that Peacock was suicidal, and Schrier answered in the affirmative.

During the initial examination by Dr. Hicks, Peacock described experiences which included awakening in a "dream world" following the motor vehicle accident, delusions that the world was going to end, and the belief that he was the last man on earth. He told Dr. Hicks that he had no previous experiences of this nature and had no recent contact with illicit drugs. Dr. Hicks noted that there was some evidence of psychomotor agitation, increased speech production, and moderate disorganization. The doctor also noted that Peacock was easily distracted, and that there was some "intermittent derailment of thought."

Peacock was admitted to the Mental Health Unit which was located on the fourth floor of the hospital. In his admitting instructions, Dr. Hicks cautioned that "the patient is to be observed, monitored and watched for worsening of his symptoms or evidence of a delirium" and added that Peacock should be secluded and restrained as needed.

Two days later, another psychiatrist, Howard Cutler, M.D., was assigned to Peacock as his ward resident. Dr. Cutler noted the possibility that Peacock was in a manic episode. He treated him with various medications and recommended continued evaluation and observation. Dr. Cutler later noted that if the patient's symptoms did not clear within a brief period, he would consider instituting lithium therapy. Dr. Cutler stated that Peacock should be observed and he was aware of Dr. Hicks' prior order that Peacock should be secluded and restrained as needed. The decision with respect to seclusion or restraints could be determined by either a physician or the nurse. However, to provide proper patient security, the hospital's policy dictated that windows in the Mental Health Unit were to

be fastened so that they could not be opened from the inside.

On March 15, 1984, Schrier visited Peacock at the hospital and was sufficiently disturbed by his behavior that he telephoned Bertha McGowan, the charge nurse, and informed her that the patient was acting strangely. Nurse McGowan went to Peacock's room at approximately 2:30 P.M. and noted a problem which she claimed that she reported to Dr. Cutler. During Nurse McGowan's absence (although other nurses were stationed on the floor) Peacock either jumped or fell through the fourth floor window of his room and suffered severe physical injuries.

### PROCEDURAL HISTORY

Peacock sued Samaritan Health Service (Samaritan) for damages alleging negligent care and supervision. Samaritan filed its answer and submitted a set of interrogatories. In answering the interrogatories, Peacock identified Samaritan's own expert witnesses for the purpose of establishing the hospital's deviations from the applicable standard of care for patients housed in a psychiatric ward. Samaritan then filed a motion for summary judgment arguing that there was an absence of expert testimony necessary to establish a *prima facie* case for medical malpractice.

In response to the motion, Peacock argued that an expert was not necessary because discovery was still in its early stages. Alternatively, he argued that there was sufficient expert testimony contained in the existing depositions of Drs. Hicks and Cutler and Nurse McGowan to establish deviation from the applicable standard. After the trial court granted summary judgment in favor of Samaritan, Peacock filed a motion for reconsideration and an alternative motion to dismiss his complaint without prejudice. He later filed the affidavit of Donald J. Garland, M.D., to support his claim that Samaritan deviated from the proper standard of care. The trial court denied both motions without comment.

### ISSUES AND LEGAL ANALYSIS

On appeal, Peacock first argues that the trial court was deprived of available evidence because Maricopa County Local Rule 2.14 prohibits the filing of discovery materials. This argument was not presented at the trial level and it is therefore waived. *Fendler v. Phoenix Newspapers, Inc.*, 130 Ariz. 475, 481, 636 P.2d 1257, 1263 (App.1981). Further, Rule 2.14 does not preclude the use of depositions and other discovery papers as exhibits to motions or responses. *See Gordinier v. Aetna Cas. & Sur. Co.*, 154 Ariz. 266, 267, 742 P.2d 277, 278 (1987). Peacock acknowledges that he failed to properly attach copies of the relevant discovery material to his response to Samaritan's motion for summary judgment. However, Samaritan did not dispute the accuracy of Peacock's representations as to the contents of the depositions and answers to interrogatories. Thus, those representations were conceded for the purpose of the motion for summary judgment, and Peacock's failure to attach the material to his response to the motion was not fatal to his position. *Id.*, n. 2.

Peacock next contends that the trial court misread *Gurr v. Willcutt*, 146 Ariz. 575, 707 P.2d 979 (App.1985) to require that every plaintiff in a medical malpractice action must present expert testimony to prove that there was a violation of the applicable standard of care. He argues that expert testimony was not required under the circumstances of this case. Alternatively, he contends that testimony elicited from Samaritan's own employees met the expert testimony requirement. Finally, he argues that the belated affidavit of Dr. Garland, filed after entry of summary judgment, established the existence of a genuine issue of material fact.

Arizona Revised Statutes § 12–563 sets forth the elements of a cause of action for medical malpractice:

The following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:

1. The health care provider failed to exercise that degree of care, skill and

learning expected of a reasonable prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances; and

2. Such failure was the proximate cause of the injury.

It is clear that § 12–563 does not require an interpretation mandating the use of expert testimony in every case. The statute only defines the elements of the cause of action. It does not describe how a plaintiff must prove these elements. However, there is substantial case law on point.

■ In order for a plaintiff to establish the statutory elements to maintain a malpractice claim, he must normally utilize medical testimony by qualified physicians. In *Riedisser v. Nelson*, 111 Ariz. 542, 534 P.2d 1052 (1975), our supreme court reaffirmed the holding in *Abernethy v. Smith*, 17 Ariz.App. 363, 498 P.2d 175 (1972), in pertinent part:

> The question of a physician's skill or failure to use his skill is a material question of fact, and on a motion for summary judgment, the party opposing the motion must show that at trial, he would be able to show evidence that the physician lacked or did not apply the proper skills.

111 Ariz. at 544, 534 P.2d at 1054. *See also Barrett v. Samaritan Health Serv., Inc.*, 153 Ariz. 138, 141, 735 P.2d 460, 463 (App.1987); *Gregg v. National Med. Healthcare Serv., Inc.*, 145 Ariz. 51, 54, 699 P.2d 925, 928 (App.1985). An exception to the general rule requiring the use of expert medical testimony occurs where "the negligence is so grossly apparent that a layman would have no difficulty in recognizing it." *Riedisser*, 111 Ariz. at 544, 534 P.2d at 1054; *see also Revels v. Pohle*, 101 Ariz. 208, 210, 418 P.2d 364, 366 (1966).

Peacock assumes that the trial court interpreted *Gurr v. Willcutt* to exclude the recognized exception, but the record does not support this assumption. Further, *Gurr* does not discuss the exception to the general rule because the exception was in no way applicable to the facts before the court in that case. The case involved the diagnosis and treatment of a heart condition and whether an appropriate pacemaker had been installed. That medical diagnosis and treatment was well beyond the understanding of lay persons and the necessity of expert testimony was therefore clear.

■ The factual question at issue in the instant case is the degree of restraint or seclusion which was appropriate for Peacock and whether the care provided by Samaritan met the appropriate standard. Any doubt as to these facts must be resolved in favor of a trial on the merits. *Arizona Civil Rights Div. v. Olson*, 132 Ariz. 20, 643 P.2d 723 (App.1982).

We find that the record raises a factual dispute at least with respect to Samaritan's alleged negligence in housing Peacock in a fourth floor psychiatric ward with a window that could be opened from the inside.

The facts of this case are analogous to those in *Lucy Webb Hayes Nat'l Training School v. Perotti*, 419 F.2d 704 (D.C.Cir. 1969). Perotti had been admitted to a closed portion of the psychiatric wing which was separated from the open section for less disturbed patients. Perotti escaped into the open section and dove through a seventh floor window which resulted in injuries leading to his death. His widow brought a wrongful death action against the hospital.

Mrs. Perotti introduced no expert testimony that reasonable prudence by the hospital staff would have prevented her husband from leaving the closed ward unattended. However, there was testimony concerning the policies and procedures for the ward in which Perotti was confined including a requirement that a staff member accompany a closed-section patient if he went into another portion of the hospital. The appellate court rejected the hospital's contention that the absence of expert testimony was fatal to establishing a *prima facie* case for wrongful death, stating:

> We think the jury could find negligence upon the part of the hospital from this evidence without the assistance of expert testimony. The jurors might not be able to determine the necessity of a closed ward for mental patients of the type

admitted to 7–W, nor to evaluate the need for restrictions upon the movement of patients into and out of the closed ward. *But the hospital itself had made these decisions....*

419 F.2d at 710 (emphasis added). *See also Dinnerstein v. United States,* 486 F.2d 34 (2d Cir.1973); *Meier v. Ross Gen. Hosp.,* 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519 (1968); *Wright v. State,* 31 A.D.2d 421, 300 N.Y.S.2d 153 (1969).

Similarly, in the instant case, the decision was made to safeguard Peacock in the hospital's psychiatric ward. Under the hospital's own standards, the window in Peacock's room was supposed to be secured by a lock mechanism which could only be opened by dismantling that mechanism. The window lock was to be fixed with screws so that the lock could not be opened unless the screws were removed. However, after Peacock's fall, nurses found his window open but did not observe any screws, screwdriver, or similar tool. Whether this sequence of events was consistent with the admitting physician's directions that plaintiff be "secluded and restrained as needed" presents a question of fact.

Our analysis does not compel the conclusion that a policy adopted by a health care provider will always equate with the standard of care to be applied by the jury in determining if the care and supervision of a patient were negligent. Indeed, this court has recently recognized that a violation of hospital protocol, standing alone, is not necessarily evidence of negligence. *Bell v. Maricopa Med. Center,* 157 Ariz. 192, 755 P.2d 1180 (App. 1988).[1] However, under the circumstances of this case, the existence of a hospital protocol is nevertheless some evidence of the standard of care. At trial, Samaritan could present rebuttal evidence that its protocol was not indicative of the appropriate standard of care; or that it was unrelated to patient safety; or that it was not relevant to this particular plaintiff's care and treatment. *See e.g., Lucy*

*Webb,* 419 F.2d at 710. In the meantime, considering Samaritan's own protocol together with reasonable inferences that can be drawn from the act of placing a reportedly suicidal patient in a fourth floor room with an unsecured window, we find that the trial court erred in granting summary judgment. Under the current posture of this case, the trier of fact could conclude that the protocol was the standard of care and that the failure to follow that standard was negligence.

Our reversal of the trial court's summary judgment makes it unnecessary for us to consider whether the trial court abused its discretion by denying Peacock's motion for reconsideration.

The judgment is reversed and this matter is remanded to the trial court for proceedings consistent with this opinion.

CORCORAN, P.J., concurs.

JACOBSON, Presiding Judge, dissenting,

I respectfully dissent. This is a medical malpractice case. The alleged malpractice is that Samaritan Health Services, in the operation of its hospital, negligently failed to provide adequate care to and supervision of Anthony J. Peacock. Specifically the negligent care and supervision consisted of placing Peacock in a 4th floor room with unsecured windows from which Peacock jumped.

The issue before the trial court and this court is whether expert medical testimony was necessary to establish that the hospital knew or should have known that Peacock was suicidal (or so disoriented that he would wander out of a 4th floor window) and that the defendant breached the applicable standard of care for a person having Peacock's mental condition.

The majority solves this problem by stating that since the hospital has a policy that all windows in the Mental Health Unit were to be secured so that they could not be

---

1. In *Bell,* the hospital produced expert testimony rebutting the patient's contention that the hospital protocol required treatment that she did not receive. Under these circumstances, we held that the patient was not entitled to a jury instruction that the hospital's violation of its protocol was evidence of negligence.

opened from the inside and since Peacock was placed in the Mental Health Unit, the standard of care applicable to Peacock was that he was to be placed in a room with windows which could not be opened from the inside. Since there is a question of fact as to whether the particular window in Peacock's room was in fact so securable, a jury issue is presented.

The problem with this syllogism is that it presupposes that a policy adopted by the hospital always establishes the standard of care regardless of the particular idiosyncrasies of the patient to which the policy is applied. It is like stating that if a hospital establishes a policy that all admittees to the hospital are only to be given blood tests upon admission, the standard of care for diagnostic purposes is only the administration of a blood test. More importantly the majority rationale would find medical malpractice on the part of the hospital for temporarily placing a non-mental patient in the Mental Health Unit and the patient while there decides to commit suicide by jumping out of a window. The adoption of a policy cannot, in an of itself, establish a standard of care absent evidence that the policy comports with the community standard of care for the particular patient involved.[1] *Bell v. Maricopa Medical Center,* 157 Ariz. 192, 755 P.2d 1180 (App. 1988).

While the cases cited by the majority can be distinguished on their facts (cases in which there were clear suicidal attempts prior to admission which were known to the hospital authorities) in my opinion the facts in this case are more akin to those in *Dimitrijevic v. Chicago Wesley Memorial Hospital,* 92 Ill.App.2d 251, 236 N.E.2d 309 (1968). In *Dimitrijevic,* the plaintiff's decedent, who was suffering from depression, was placed in a room on the 11th floor of the hospital next to an unsecured window. The decedent leaped from the window to his death. Although there was evidence that the decedent had "suicidal thoughts" and that it was suggested that the decedent be placed in a ward with locked doors and windows, there was also expert testimony that he was not a "suicid-

al risk." In reviewing whether the expert testimony was properly admitted, the court noted the general rule that expert testimony is usually necessary to show that defendant doctors and hospital did not use the requisite care. An exception to this rule, which allows the jury to pass on the adequacy of care given patients who commit suicide without the benefit of expert testimony, exists when the alleged negligence is "grossly apparent" or within the "common knowledge" of laymen. *Id.* The court then distinguished the cases cited by the plaintiff as falling within this exception.

> In those cases there was no question but that the patients were suicidal risks. The patients had made previous attempts on their lives, the defendants acknowledged the serious risk of suicide and took precautions. The jury was allowed to evaluate whether the patients were watched closely enough in view of their admittedly pronounced suicidal tendencies. In the instant case the question is much farther from the ken of the lay mind: were the symptoms of the decedent such that a reasonably skillful doctor using customary methods would have regarded decedent as a suicidal risk requiring special precautions?

*Id.* at 255, 236 N.E.2d at 313. This analysis is equally applicable to those cases cited by the majority.

As was summarized in plaintiff's response to defendants' motion for summary judgment, Peacock's "suicidal tendencies" were not that evident. On March 13, 1987, after not showing up for work, two coworkers found him at home, naked. There was a burned hole in the rug and a rifle nearby. This episode was related to the admitting doctors. At the time he was admitted at Good Samaritan he had apparently returned to normal and was embarrassed about his behavior and talked freely to the admitting doctor, Dr. Hicks. He related that he was "in a dream world" that "someone was out to get him" and that he was the last man on earth. He was admitted to the Mental Health Unit and

---

**1.** Admittedly there may well exist standards of care applicable to all hospital patients, regardless of their underlying illness. However, it has not been suggested that all patients who suffer mental problems are required to be placed in a tamper-free environment.

was to be "observed, monitored and watched for worsening of his symptoms or evidence of delirium." The nurse, on his admission found him to be pleasant and cooperative. At midnight he was found in his street clothes and remained awake until 2:00 a.m. At 5:30 a.m. was cooperative and anxious to get his "head on straight." He talked about the pressures of the job and the need to get new accounts. He was ashamed of his behavior of the past few days.

On March 14, he was diagnosed as having the "possibility of manic episodes," "inability to sleep" and "agitation." On the same day, his co-workers found him "fairly normal."

On March 15, the co-worker thought he "had that funny look about him, a blank expression on his face." At 2:30 the co-worker's concerns were expressed to the charge nurse, who upon observing him concluded that "there was obviously a problem" and "there was a change in his behavior." At 3:07 Peacock was admitted to the emergency room after being found on the hospital grounds.

Under these circumstances I am not prepared, as the trial judge was not prepared, to say that it is completely obvious to a layman that the hospital knew or should have known that Peacock was suicidal and that precautions were necessary to keep him from harming himself.

The fact that the hospital has adopted a blanket policy concerning the operation of its mental unit, does not answer the question of whether it fell below the applicable standard of care as to Mr. Peacock. In my opinion that standard of care as to Mr. Peacock can only be established by expert testimony.

Peacock was not able to supply that testimony and even the affidavit, belatedly submitted 6 weeks after summary judgment was granted, does not supply the necessary standard.

I would affirm.