823 P.2d 1339

**Irma Marnie POTTER and Lawrence J. Potter, wife and husband, Plaintiffs–Appellants,**

v.

**H. KERN WISNER, M.D., P.C., an Arizona corporation; H. Kern Wisner, M.D. and Jane Doe Wisner, husband and wife, Defendants–Appellees.**

No. 1 CA–CV 89–470.

Court of Appeals of Arizona, Division 1, Department E.

Sept. 12, 1991.

Review Denied Feb. 19, 1992.

Gove L. Allen, Mesa, for plaintiffs-appellants.

Teilborg, Sanders & Parks, P.C. by Bruce C. Smith, Frank A. Parks, John T. Crotty, Phoenix, for defendants-appellees.

## OPINION

GRANT, Judge.

This is an appeal from a directed verdict in favor of the defendant in a medical malpractice case. The sole issue is whether the testimony of the defendant, H. Kern Wisner, M.D., was sufficient to establish the standard of care in disclosing the possible risks connected with the operation. For the reasons which follow, we hold that the testimony was sufficient to submit the issue to the jury for determination and we therefore reverse and remand the case for further proceedings.

### FACTS

The plaintiff (Potter), suffered from painful lumps in both breasts, a condition diagnosed as fibrocystic disease. She went to the defendant (Dr. Wisner), a plastic surgeon, for a bilateral mastectomy with reconstruction and implants. Dr. Wisner's plan was to remove as much of the breast tissue as possible and to rebuild the breasts using prosthesis, a procedure medically referred to as bilateral subcutaneous mastectomy with subpectorial augmentation and reconstruction. After the surgery, Potter had complications with her left breast. The breast blackened and the nipple eventually scabbed off. She left Dr. Wisner's care after he recommended further reconstruction by "borrowing" some of the right nipple. Potter sued Dr. Wisner for medical malpractice. Eventually, Potter dropped all allegations except her claim that Dr. Wisner failed in his duty to properly disclose the risks associated with the operation and to obtain her informed consent to the surgery.

### PROCEDURAL HISTORY

■ Potter proceeded first before a Medical Liability Review Panel pursuant to A.R.S. § 12–567.[1] The panel found in favor of Potter and concluded that the defendant had fallen below the standard of care by failing to obtain plaintiff's informed consent.[2]

At the close of the plaintiff's evidence, the defendant moved for a directed verdict based on plaintiff's failure to establish the standard of care in disclosing the potential hazards of the operation. The motion was taken under advisement and argument continued the next day. The judge again continued the "hearing," and the plaintiff moved to reopen her case to elicit testimony from the defendant and one of his witnesses, Dr. Wingate. The court granted the motion to reopen, allowing examination of the defendant only. After the defendant's testimony, the court granted the motion for directed verdict. The court signed a formal order granting the motion for directed verdict "on the issues of (1) informed consent and, (2) *res ipsa loquitur* and, (3) standard of care in performance of surgery, and (4) standard of care in the management of Mrs. Potter post-operatively...." The plaintiff filed a motion for reconsideration and motion for new trial both of which were denied.

### ISSUES

This appeal raises two issues:

1. Whether the plaintiff in a medical malpractice case can meet her burden of proof of the standard of care through the defendant doctor's own testimony.

2. If so, whether the defendant doctor's testimony in this case was sufficient to establish the standard of care.

### DISCUSSION

We must decide whether the defendant doctor's own testimony regarding what he believed must be divulged to the patient was sufficient to establish the standard of care for obtaining informed consent for this type of medical procedure.

---

1. Arizona Revised Statutes § 12–567 was subsequently repealed by Laws, 1989, ch. 289, § 1.

2. Plaintiff failed to introduce this evidence of the panel's finding at trial for reasons we are unable to determine. Because this evidence was not introduced at trial, this court cannot consider the panel decision in deciding the issue before us. *O'Malley Lumber Co. v. Riley*, 126 Ariz. 167, 169, 613 P.2d 629, 632 (App.1980).

■ A motion for directed verdict should be granted only when, without weighing the credibility of the witnesses, there is no difference of opinion over the factual issues in controversy. *Orme School v. Reeves,* 166 Ariz. 301, 308, 802 P.2d 1000, 1007 (1990). *Orme School* warned that directed verdicts should not be substituted for jury trials simply because the trial judge believes the moving party should win or will win the jury's verdict. *Id.* at 310, 802 P.2d at 1009. If the jury believed Potter's testimony, it could have concluded that Dr. Wisner's performance as to informed consent did not meet his own standard, which we hold the jury could have found to be the appropriate standard of care for disclosure among plastic surgeons practicing in the State of Arizona.

■ "[T]he duty of disclosure of the risks by the physician or surgeon is measured by the usual practices of the medical profession." *Riedisser v. Nelson,* 111 Ariz. 542, 544, 534 P.2d 1052, 1054 (1975). Establishing the standard of care regarding the "duty to warn" generally requires expert medical testimony. *Id.* at 545, 534 P.2d at 1055, *quoting Govin v. Hunter,* 374 P.2d 421, 424 (Wyo.1962). A plaintiff in a medical malpractice action must present expert testimony to establish (1) the general standard of care exercised by physicians in the defendant's field of practice under similar circumstances, and (2) that the defendant deviated from that standard of care in the present case. *See e.g., Bell v. Maricopa Medical Center,* 157 Ariz. 192, 194–95, 755 P.2d 1180, 1182–84 (App. 1988).

■ It is accepted in Arizona, however, that the defendant/physician's own testimony can establish that standard of care. *See e.g. Vigil v. Herman,* 102 Ariz. 31, 34, 424 P.2d 159, 162 (1967) (in a medical malpractice case, the community standard of care may be established by defendant doctor's own testimony); *Stallcup v. Coscarart,* 79 Ariz. 42, 46, 282 P.2d 791 (1955), *quoting Bickford v. Lawson,* 27 Cal. App.2d 416, 421, 81 P.2d 216, 219 (1938) (expert testimony establishing plaintiff's prima facie case in a malpractice action

may be that of the defendant); *Evans v. Bernhard,* 23 Ariz.App. 413, 416, 533 P.2d 721, 724 (1975) ("The medical standard of care must be established by expert medical testimony.... However, third party expert testimony is not always necessary as this standard can be established by the defendant doctor's own testimony.")

Moreover, the more recent cases, *Peacock v. Samaritan Health Service,* 159 Ariz. 123, 765 P.2d 525 (App.1989), and *Bell v. Maricopa Medical Center,* 157 Ariz. 192, 755 P.2d 1180 (App.1988), do not deviate from this general rule. In *Peacock* and *Bell,* the plaintiff argued that adherence to a hospital's own protocol or standard should be evidence of the community's standard of care. In *Bell* this argument was rejected, 157 Ariz. at 195, 755 P.2d at 1183, while in *Peacock* it was accepted. 159 Ariz. at 127, 765 P.2d at 529.

In her case, the plaintiff obtained testimony from the defendant regarding what he considered to be his obligations in informing a patient of the risks of the operation. The risks which he thought he should divulge to a patient considering a mastectomy with reconstruction were: (1) infection; (2) hematoma; (3) scars; (4) drains; (5) loss of skin; (6) loss of nipple and/or areola; (7) loss of the implant; (8) contracture; (9) exposure of the implant; and (10) the impossibility of removing all of the breast tissue. The plaintiff testified that the defendant did *not* inform her of the possibility of losing the nipple and/or areola.

The plaintiff attempted to use the defendant's testimony as her expert testimony on the standard of care required of plastic surgeons. The defendant asserts that his testimony could not be used for that purpose because he testified he was not familiar with the proper standard. The defendant testified as follows on cross-examination:

Q. Do you have an opinion today as to what sorts of risks and descriptions of results should be given to such a bilateral subcutaneous mastectomy with implant candidates? I'm asking *if you have an opinion as to what the standard of care would require to be given?*

A. *I can tell you what I do in my practice and what my experience has been.*

Q. *Doctor, do know what the standard is?*

A. *I can tell you what my standard is in my office and what I do with patients as to what I tell them, what they can expect and what the risks and complications are that I inform them of.*

\* \* \* \* \* \*

Q. Are you telling me that you do that entirely on your own and that you don't know what is common practice of other plastic surgeons in Maricopa County?

A. I can tell you what my experience and customs is [sic], but I can't tell you exactly what every plastic surgeon in the county does.

\* \* \* \* \* \*

Q. Are you saying ... that you don't know what is a standard expected of plastic surgeons in Maricopa County or State of Arizona prior to subcutaneous mastectomy implants?

A. *I can tell you that with my experience and reading, that my custom and habit is to give the patient information as [to] the substantial risks that they can expect from this type of procedure.*

Q. And is your practice in accordance with what is typical procedure within the State of Arizona for plastic surgeons?

A. I assume so.

\* \* \* \* \* \*

Q. And to your knowledge and experience and training, *this list [of items that you would disclose to a patient as expected results] is pretty much uniform throughout the plastic surgery society, at least in the State of Arizona?*

A. *I would assume so.*

Q. Well, but you don't know of any other—any other sort of requirements or risks or lower requirements, do you?

A. *I can testify as to my custom and practice, but I can't—I don't know whether I can testify as to what some-*

*one else does in their office* because I don't go into their offices, and I can tell you what I can read in the literature. I can tell you discussions that we have had of meetings and course we have had at meetings, and as far as I can ascertain, the custom and habit in my office to inform a patient is probably as good as any.

(Emphasis added.)

Although *Vigil, Stallcup,* and *Evans* permit a defendant physician to testify as to the standard or care, the *Evans* court warns that "[t]he personal and individualistic method of practice of ... one doctor [is] not sufficient to establish" the standard of care for the medical community. 23 Ariz. App. at 416, 533 P.2d at 724. In *Evans* the physician testified as to his own practice of assisting in surgery, his practice with regard to his participation in post-operative management, and his usual rapport with specialists to whom he has referred a patient. *Id.* Although conceding that the defendant physician can testify as to the standard of care, the *Evans* court held that the defendant doctor's "testimony as to his usual personal practice was not sufficient to establish a general medical standard." *Id.* Since no other expert testimony was introduced by the plaintiff to establish the standard of care, "the trial court was correct in granting summary judgment for Dr. Bernhard on the issue of his independent negligence." *Id.*

Similarly, in the present matter, the plaintiff did not provide any third party expert testimony to establish the standard of care.[3] Rather, she relied upon the defendant to provide the standard of care. Thus, the only question remaining is whether the defendant's testimony in fact established the standard of care or whether it simply showed the "personal and individualistic method of practice of this one doctor." *Id.*

The plaintiff relies on the supreme court's decision in *Stallcup* to support her

---

**3.** The plaintiff attempted to obtain testimony from a Dr. Wingate who was listed as a witness by the defendant. The trial court denied her this opportunity and she appears to have abandoned this approach in this court.

position that the defendant's testimony was sufficient to establish the standard of care for disclosure of risk, despite the defendant's claimed ignorance of that standard. In *Stallcup,* the supreme court held that the defendant doctor's testimony had established the standard of care for post-operative care even though he too claimed ignorance. 79 Ariz. at 49, 282 P.2d at 796. The *Stallcup* court stated, "we must presume that in narrating the postoperative care which defendant testified was given to plaintiff he intended to convey the fact that such treatment was performed with that reasonable care and skill to which defendant was required to adhere in this community." Potter asserts that the *Stallcup* court's holding is based on a presumption that a licensed physician is acquainted with the standard of care relating to his area of practice, and therefore, that when testifying concerning his practice, the practice coincides with the standard of care followed by other physicians in the community. The supreme court did discuss those presumptions. *See Stallcup,* 79 Ariz. at 48–49, 282 P.2d at 795. It appears, however, that the court's holding may have been based rather on Doctor Stallcup's acknowledgment that if a person were treated the way the plaintiff's witnesses testified that plaintiff was treated, that would be unacceptable:

> *The above statement that the post-operative treatment claimed to be given according to the testimony of plaintiff's witnesses, was unfit to be administered to a human being,* justified the jury, if they believed the testimony of plaintiff's wife and other witnesses, in finding that defendant's postoperative treatment of plaintiff was not in conformity with the standard in this community to which defendant is required to adhere and unless the court committed reversible error in instructing the jury, the judgment must be affirmed.

79 Ariz. at 50, 282 P.2d at 796 (emphasis added). *Cf. Asphalt Engineers, Inc. v. Galusha,* 160 Ariz. 134, 770 P.2d 1180 (App.1989) (an attorney malpractice case where the court stated: "Expert testimony was unnecessary in light of Galusha's own

acknowledgement that the alleged conduct fell below the standard of care.") Wisner did not make a similar admission in this case and therefore, the presumption discussion in *Stallcup* may not fully control.

The present case presents a dilemma caused by a split in authority in Arizona. In *Harris, Evans,* and *Bell,* the court held that evidence of a practice by an individual doctor or a limited group of health care professionals is insufficient to establish the necessary standard of care. *Peacock* holds the opposite.

In *Harris v. Campbell,* 2 Ariz.App. 351, 409 P.2d 67 (1965), the plaintiff asserted that the defendant doctor had botched a hysterectomy by removing too much tissue, leaving her unable to have sexual intercourse. The court granted the doctor's motion for directed verdict based in part on the plaintiff's failure to sufficiently prove that the operation caused, rather than was merely a possible cause of, the plaintiff's condition. *Id.* at 354, 409 P.2d at 70. The plaintiff's expert would have testified that it is preferable to err on the side of removing too little tissue than too much, and that he had always been able to remove the right amount. *Id.* at 355, 409 P.2d at 71. The trial court rejected that offer of proof; and this court affirmed, holding that this evidence would have been insufficient to demonstrate the applicable standard of care. *Id.* The court stated:

> We cannot see that any of this would alter the case. It is not evidence that the appellee-doctor did something which the recognized standard of good medical practice forbids, or that he failed to do something which such standard requires.
>
> If a physician who is a specialist in the field of medicine fails to apply the skill and learning which is required of similarly situated physicians in that community, he is guilty of malpractice. If he does something which the recognized standard of good medical practice forbids, or fails to do something which such standard requires, he likewise is guilty of malpractice.... As we view it, testimony that one specialist has experienced a different result than what another specialist has

experienced is not proof of the standard, nor is the fact that certain surgeons select a particular course as between two in an operation, each of which might lead to a different unsatisfactory result proof of the standard. The standard must be based on the care and skill which is exercised generally by physicians of ordinary care and skill in the community involved or similar communities.

*Id.* (citations omitted).

*Evans v. Bernhard,* 23 Ariz.App. 413, 533 P.2d 721 (1975), involved a motorcycle accident in which the plaintiff's leg was broken. After an operation performed by Dr. Fridena, an orthopedic specialist, Evans's left leg was 1½ inches shorter than the right. In an attempt to equalize the legs, Dr. Fridena performed a second surgery designed to lengthen the left leg. However, the operation shortened the leg another 1½ inches; and the patient sued Dr. Fridena, the hospital, and Dr. Bernhard, who had assisted Dr. Fridena. Dr. Bernhard was a family physician and not an orthopedic specialist. The appeal was from a summary judgment granted to Dr. Bernhard and the issue was whether he was negligent in assisting Dr. Fridena. This court affirmed the summary judgment, stating:

The asserted independent negligence of Dr. Bernhard stems from his assisting in the second operation despite his limited experience in the surgical field as well as in orthopedics; his failure in ascertaining the type of surgery contemplated by Dr. Fridena; in failing to stop the surgery once he realized what was contemplated and that he was unable to comprehend the technique involved; plus his failure to make a pre-operative examination of the patient. The appellant asserts that ... Dr. Bernhard's own testimony established the applicable standard.

... Since no independent expert medical testimony was presented, Dr. Bernhard's own responses must therefore be examined. Dr. Bernhard testified as to the usual rapport that exists with a specialist to whom he has referred a patient and stated that his relationship with Dr.

Fridena in this regard was quite unusual, as there was so little contact between the doctors. He also testified that in his own practice when assisting in surgery, he normally participates in a patient's preoperative management and is apprised of the contemplated surgery. This did not occur here. However, Dr. Bernhard's testimony as to his usual personal practice was not sufficient to establish a general medical standard. *Karrigan v. Nazareth Convent & Academy, Inc.,* 212 Kan. 44, 50, 510 P.2d 190, 196 (1973); *Collins v. Itoh,* 160 Mont. 461, 469, 503 P.2d 36, 41 (1972). *The personal and individualistic method of practice of this one doctor is not sufficient to establish a reasonable basis for any inference that he has departed from the general medical custom and practice in the community, nor can it support a conclusion that he was negligent in any regard by not following his own usual procedure. Downer v. Veilleux,* 322 A.2d 82, 88 (Me.1974); *Davis v. Virginian Railway Co.,* 361 U.S. 354, 80 S.Ct. 387, 4 L.Ed.2d 366 (1960). Therefore, as the plaintiff failed to show the standard of the medical community in this particular case, the trial court was correct in granting summary judgment for Dr. Bernhard on the issue of his independent negligence.

*Id.* at 416, 533 P.2d at 724 (emphasis added).

*Bell v. Maricopa Medical Center,* 157 Ariz. 192, 755 P.2d 1180 (App.1988), involved a plaintiff who came to the hospital with premature onset of labor. She was given a drug, terbutaline, to prevent premature labor and was released after the contractions stopped. The contractions resumed, however, and eventually the baby was delivered prematurely. During the birth the baby was given more oxygen than she would have normally received at that stage of development, which resulted in blindness in one eye. *Id.* at 193, 755 P.2d at 1181. The plaintiff claimed that the hospital's own protocol regarding terbutaline required that a patient be given oral doses to prevent the recurrence of contrac-

tions following initial treatment. *Id.* at 194, 755 P.2d at 1182. The hospital's experts asserted that the protocol did not require that. The plaintiff requested an instruction that if the jury found the hospital had violated its own protocol, then that would be evidence of defendant's negligence or falling below the standard of care. The trial court rejected the instruction and this court affirmed:

> Arizona Revised Statutes § 12–563 governs the plaintiff's burden of proof in medical malpractice actions. In order to satisfy the requirement of establishing a standard of care and a deviation from that standard, the plaintiff must present evidence that "[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances." A.R.S. § 12–563.

In their opening brief, the Bells make the following argument in support of the contested instruction:

> "While a hospital's voluntarily assumed standards, protocols, and regulations may not conclusively prove the legal standard of care (the protocols may rise above the legal standard or fall below it), they are surely some evidence of the standard. Therefore, Maricopa Medical Center's failure to follow the protocol it established is evidence of its negligence."

This argument reveals the logical flaw in the Bells' proferred instruction. Medical negligence is the failure of a health care provider to act in accordance with the standard of care determined by the jury to be applicable in a given case. The jury cannot consider whether a medical malpractice defendant has acted negligently until it has determined the standard against which the defendant's conduct is to be measured. There is a difference between the evidence the jury considers in determining the standard and the standard itself. Only a deviation from the standard itself constitutes evidence of negligence. Consequently, the jury in the present case could not have found that the hospital's violation of its protocols constituted evidence of negligence unless it first found that the protocols were not merely evidence of the applicable standard, but were synonymous with it. Since the Bells' proferred instruction omits this prerequisite to a finding that violation of the protocols constitutes evidence of negligence, it is an incorrect statement of law. The trial court's refusal to give it was therefore proper. *Nichols v. Baker,* 101 Ariz. 151, 154, 416 P.2d 584, 587 (1966).

157 Ariz. at 194–95, 755 P.2d at 1182–83 (footnote omitted). In *Bell* no evidence had been offered linking the hospital's protocol with the standard of care.

The court did an about-face in *Peacock v. Samaritan Health Service,* 159 Ariz. 123, 765 P.2d 525 (App.1988). Peacock was admitted to the defendant hospital when his friends feared he was suicidal after some bizarre behavior following an automobile accident. *Id.* at 124, 765 P.2d at 526. He was placed in the fourth-floor psychiatric ward and was severely injured when he either fell or jumped out an unsecured window. Under hospital rules, the window in his room was supposed to be secured so that it could not be opened without disassembling a lock mechanism. The hospital won summary judgment based on the plaintiff's lack of expert testimony regarding the standard of care.

On appeal, one of the plaintiff's arguments was that the negligence was so "grossly apparent" it required no expert testimony. *See Riedisser v. Nelson,* 111 Ariz. at 544, 534 P.2d at 1054.[4] This court agreed with that contention, reversing and remanding the case for further proceedings. However, in so doing the court stepped beyond the "grossly apparent" doctrine and accepted the hospital's own rule or protocol as evidence of the standard of care even though there was no evidence

---

**4.** Potter does not argue that negligence in failing to disclose the risk of loss of the nipple and/or areola is so grossly apparent that expert testimony is unnecessary.

linking the two. The court relied heavily on *Lucy Webb Hayes Nat'l Training School v. Perotti*, 419 F.2d 704 (D.C.Cir. 1969), in which the plaintiff's decedent had committed suicide by jumping out of an unprotected seventh floor window of a psychiatric ward, having previously escaped from the closed section of the ward. The *Peacock* court stated:

> Mrs. Perotti introduced no expert testimony that reasonable prudence by the hospital staff would have prevented her husband from leaving the closed ward unattended. However, there was testimony concerning the policies and procedures for the ward in which Perotti was confined including a requirement that a staff member accompany a closed-section patient if he went into another portion of the hospital. The appellate court rejected the hospital's contention that the absence of expert testimony was fatal to establishing a *prima facie* case for wrongful death, stating:
>
>> We think the jury could find negligence upon the part of the hospital from this evidence without the assistance of expert testimony. The jurors might not be able to determine the necessity of a closed ward for mental patients of the type admitted to 7–W, nor to evaluate the need for restrictions upon the movement of patients into and out of the closed ward. *But the hospital itself had made these decisions.* ...
>
> Similarly, in the instant case, the decision was made to safeguard Peacock in the hospital's psychiatric ward. Under the hospital's own standards, the window in Peacock's room was supposed to be secured by a lock mechanism which could only be opened by dismantling that mechanism. The window lock was to be fixed with screws so that the lock could not be opened unless the screws were removed. However, after Peacock's fall, nurses found his window open but did not observe any screws, screwdriver, or similar tool. Whether this sequence of events was consistent with the admitting physician's directions that plaintiff be "se-

cluded and restrained as needed" presents a question of fact.

159 Ariz. at 126–27, 765 P.2d at 528–29 (citations omitted) (emphasis by the Arizona Court of Appeals). The *Peacock* court recognized that *Bell* is in conflict:

> Our analysis does not compel the conclusion that a policy adopted by a health care provider will always equate with the standard of care to be applied by the jury in determining if the care and supervision of a patient were negligent. Indeed, this court has recently recognized that a violation of hospital protocol, standing alone, is not necessarily evidence of negligence. *Bell v. Maricopa Med. Center*, 157 Ariz. 192, 755 P.2d 1180 (App.1988). However, under the circumstances of this case, *the existence of a hospital protocol is nevertheless some evidence of the standard of care.* At trial, Samaritan could present rebuttal evidence that its protocol was not indicative of the appropriate standard of care; or that it was unrelated to patient safety; or that it was not relevant to this particular plaintiff's care and treatment. *See e.g., Lucy Webb*, 419 F.2d at 710. In the meantime, considering Samaritan's own protocol together with reasonable inferences that can be drawn from the act of placing a reportedly suicidal patient in a fourth floor room with an unsecured window, we find that the trial court erred in granting summary judgment. *Under the current posture of this case, the trier of fact could conclude that the protocol was the standard of care and that the failure to follow that standard was negligence.*

159 Ariz. at 127, 765 P.2d at 529 (footnote omitted) (emphasis added). In a footnote to the above-cited passage, the *Peacock* court attempted to distinguish *Bell*:

> In *Bell*, the hospital produced expert testimony rebutting the patient's contention that the hospital protocol required treatment that she did not receive. Under these circumstances, we held that the patient was not entitled to a jury instruction, that the hospital's violation of its protocol was evidence of negligence.

*Id.* This attempted distinction is not totally satisfactory. The court in *Bell* rejected the plaintiff's requested instruction because, without testimony showing that the hospital protocol was equivalent to the standard of care, evidence that the protocol was violated could not be evidence of negligence. The holding was not based on conflicting expert testimony, but rather on the lack of a connection between the protocol and the standard. Thus, rather than distinguishing *Bell*, *Peacock* seems only to reject its reasoning.

The statements in *Bell* and *Harris* are only dicta as far as our case is concerned. The narrow issue in *Bell* was whether the court should have given an instruction allowing the jury to find negligence from the hospital's violation of its own rule, absent any evidence tieing that rule to the standard of care. The court held that other evidence on the standard of care was sufficient to submit the case to the jury. *Bell,* 157 Ariz. at 196, 755 P.2d at 1184.

Wisner testified to his own standard in divulging risks to surgery candidates, and this standard included informing the patient of the risk of losing the nipple and/or areola. He stated that his standard was as good as any and assumed it was uniform for plastic surgeons in Arizona. Under this court's holding in *Peacock,* that testimony constituted some evidence of the standard of care. *See* 159 Ariz. at 127, 765 P.2d at 529. Potter testified that Wisner did not inform her of the possibility of losing the nipple and/or areola. Therefore a factual dispute existed to be resolved by the jury as the trier of fact. The credibility to be given the witness is always a question for the jury.

We consider whether a directed verdict was properly granted based on *Orme School.* If the jury believed Potter's testimony, then it could have concluded that Wisner's performance did not meet his own standard, which it could have found to be the appropriate standard of care. It follows that the trial court erred in directing a verdict in favor of the defendant.

The judgment is reversed and the case is remanded for trial or further proceedings consistent with this opinion.

CLABORNE, P.J., and SHELLEY, J., concur.